**Josiah HENSON, Appellant,**

v.

**The HONOR COMMITTEE OF U. VA., The Rector and Visitors of U. Va., Appellees.**

No. 82–1110.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1983.

Decided Oct. 5, 1983.

Rehearing Denied Dec. 5, 1983.

---

**70**

Josiah Henson, pro se.

William B. Poff, Thomas T. Lawson, Roanoke, Va. (Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., George G. Grattan, IV, Legal Advisor, University of Virginia, Charlottesville, Va., on brief), for appellees.

Before SPROUSE and CHAPMAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

SPROUSE, Circuit Judge:

Josiah Henson appeals the district court's grant of summary judgment in favor of the Rector and Visitors of the University of Virginia, the administrative governing body of the University, and the University's Honor Committee, a student-operated disciplinary board. Henson, who, at the time of the suit, was a third-year law student of the University of Virginia School of Law, sought injunctive and declaratory relief in federal district court prohibiting the Honor Committee from imposing sanctions against him for his alleged violations of the University Honor Code.[1] He also demanded damages for the alleged failure of the defendants to afford him the minimum protections

of due process. We affirm the district court's grant of summary judgment.

## I.

Henson entered the University of Virginia School of Law in the fall of 1975, with an expressed interest in international law. He held offices in the Virginia chapter of a student international law society, and was later elected president of the national Association of Student International Law Societies (ASILS), in Washington, D.C. While serving in this position, he was charged by fellow University of Virginia students with removing a moot court problem from national headquarters and was subsequently tried by the Honor Committee during his third year of law school.

Henson's difficulties with the school were not confined to the charges before the Honor Committee. He faced sanctions from the Academic Review Committee of the law school in entirely separate proceedings, because of his inability or unwillingness to complete coursework in a timely fashion. His inattention to academic pursuits entangled Henson in that Committee's proceedings at about the same time that he faced charges from the Honor Committee. To understand fully the district court's disposition of Henson's suit, we must examine individually the various proceedings in which he was involved.

## A.

*Academic Review Committee Proceedings*

Henson failed to complete the required coursework in three subjects during the spring semester of his second year of law school. He was notified about the deficiencies in the fall semester of his third year and was asked to complete overdue course papers. After unsuccessful attempts were made in the intervening months to persuade

1. Henson was originally charged with stealing funds from a student organization and removing a moot court problem from the Office of the Executive Secretary of the Association of Student International Law Societies. The theft-of-funds charge was later dropped and the additional charge of lying about his role in the

removal of the moot court problem made part of the complaint. Henson's conviction on any of the charges would have resulted in permanent dismissal from the University had the Honor Committee found his conduct reprehensible.

Henson to supply his instructors with the delinquent papers, Assistant Dean BeVier officially notified Henson that he would receive failing grades for the three courses.[2] Henson met with Professor BeVier on May 10, 1978, at which time she reaffirmed her decision of May 1, 1978, that he would be excluded from further study at the University for academic reasons.[3]

Henson appealed his academic expulsion, but before the Academic Review Committee could consider the issue, Henson was convicted of Honor Code violations in completely separate proceedings. His appeal of his expulsion was eventually considered and denied in April, 1980. The Academic Review Committee nevertheless decided to readmit him conditionally to the School of Law for the Fall 1980 term. The conditional admission required Henson to complete satisfactorily another semester of classwork in order to satisfy his degree requirements. He reenrolled, attended classes, and passed examinations in two courses, but failed to take examinations in two other courses. Henson was again notified that he would receive failing grades in the courses he had not completed. He appealed that ruling to the Academic Review Committee which, in a lengthy opinion dated April 23, 1981, upheld the decision of the associate dean to exclude Henson for a second time because of academic deficiencies.

## B.

### The Honor Committee Proceedings

Several months after Henson received the initial notice of his academic deficiencies in late 1977, students from the international law society filed charges against him, alleging that he had violated the Honor Code by removing a moot court problem from the ASILS offices in Washington. These charges, unrelated to his academic failures, were processed according to the student-operated Honor System. He was tried before the Honor Committee in late May, 1978, and convicted. His conviction was set aside after an appeal, and he was retried in November, 1978, and again convicted. After a series of student administrative appeals, the conviction was overturned a second time and he was granted a third trial. The students bringing the charges, however, withdrew the allegations in January, 1981, terminating Honor Committee proceedings. Approximately two months later, Henson was excluded from the law school because of the academic deficiencies earlier described.

## C.

### The District Court Proceedings

While both the Academic Review Committee and Honor Committee proceedings were underway, Henson filed a complaint in the district court on November 28, 1978, alleging that the Honor Committee and the University had violated his due process rights in the first Honor Committee trial. The University moved for dismissal under Federal Rule of Civil Procedure 12(b)(1), (2), and (6) for lack of personal and subject matter jurisdiction, and for failure to state a claim upon which relief could be granted. In support of the motion, the University filed the affidavit of the President of the Honor Committee, explaining its procedures and attesting that all the procedures had been fully followed in the Henson trial. The University also filed the affidavit of a Law School official attesting to the facts leading to Henson's academic exclusion. Henson's complaint was verified, but Henson filed no counter-affidavits to those submitted by the University. The district court delayed a decision pending the conclusion of the University disciplinary proceedings. Once those proceedings concluded, the court treated the dismissal request and supporting affidavits as a motion for sum-

---

**2.** Henson describes extenuating circumstances which he feels contributed to his failing grades. These circumstances, and whether they in fact aggravated his academic failings, do not bear on the issues we consider.

**3.** The School of Law automatically excludes a student who receives four (4) exclusion points during his third year. Henson's failing grades in three courses placed him over the limit.

mary judgment[4] and, in an order dated May 15, 1981, ruled that:

> Plaintiff has never contended that the Honor Committee departed from its own procedures in prosecuting the cases against him. The court finds that while the Honor Committee's judicial process does not precisely mimic those of a court of law, they are easily adequate to the fundamental purposes of due process. The judicial model of the court system is not required or even suited for the proceedings of all administrative agencies. However, the Court is satisfied that the action of the Honor Committee against Henson in this case is both outside the realm of constitutionally required due process and at the same time fully adequate to it.

The district court alternatively held that summary judgment was appropriate because the issues raised in Henson's complaint were moot. The court erroneously stated that Henson had graduated at the time of its ruling. It correctly found, however, that the charges against Henson had been dropped, terminating the Committee proceedings, and that Henson's suspensions resulted from his academic problems, not from the Honor charges and trials. Moreover, the trial court was advised at the time it executed the summary judgment order that Henson in fact had been excluded prior to graduation and the district court subsequently, with knowledge of this fact, refused Henson's motion to withdraw the summary judgment order.[5]

## II.

### A.

We may easily sympathize with the plight of a student caught up in extracurricular activities which proved detrimental to his academic well-being. We may even sense that the misfortunes which ultimately befell Henson could be disproportionate to whatever his omissions or transgressions might have been. At the same time, the Law School administration cannot be faulted. It had nothing to do with either the creation of the Honor System at the University or Henson's involvement with it. Even assuming Henson's prolonged entanglement with the Honor Committee affected his ability to complete his examinations after his readmission in 1980, this entanglement could not have contributed to his original academic problems. Those problems were traceable to his activities in Spring 1977, well before he became immersed in his protracted battle with the Honor Committee.

The Academic Review Committee exercised its responsibilities in a sympathetic fashion. This is evidenced by its action in readmitting Henson while he was still embroiled in the last stages of the Honor Committee proceedings. Had Henson successfully completed four courses, his long ordeal would have ended. Once again, however, he failed to complete the course requirements. We cannot judge the reasons he offers on appeal for these failures—that task belongs properly to the law school administrators. The limit of judicial inquiry into academic administration is early reached, and we need not even approach the limit to realize that, as unfortunate as his ultimate position may be, Henson was fairly treated academically. *See Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

---

**4.** Rule 12(b) of the Federal Rules of Civil Procedure provides in relevant part: "If on a motion asserting the defense numbered (6) to dismiss for failure ... to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...."

**5.** The trial court's decision—to the extent that it suggested Henson's procedural due process claims were moot, because the disciplinary charges had been dropped—was in error. The Supreme Court has made it plain that the deprivation of procedural due process creates an independent right to seek, at a minimum, nominal damages. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Henson sought both injunctive and monetary relief in his 42 U.S.C. § 1983 action against the University. Thus, his request for damages remained a live controversy even after the disciplinary proceedings were dropped.

## B.

It is true that Henson could have been damaged in a number of ways by the charges of misconduct and the seemingly endless Honor System hearings—including a diminution of his ability to study after readmission. The same sort of damage, however, could flow from a trial conducted by the most judicious of our courts. Damage, no matter how great, is not compensable unless it was caused by the University's actions. *See Carey v. Piphus,* 435 U.S. 247, 254–55, 98 S.Ct. 1042, 1047–48, 55 L.Ed.2d 252 (1978). In this instance, Henson asserts he was wronged by the denial of due process. The due process deficiency he claims is the facial inadequacy of the Honor System procedures. We agree, however, with the district court that Henson's due process attack on the facial validity of the procedures must fail. Individually, we might disagree with the wisdom of entrusting the Honor System's vital controls to the hands of University students—possibly sometimes more volatile than mature. Constitutionally, however, we cannot impose these views on University administrators.

Henson's principal contention on appeal is that the Honor Code procedures violate due process in two critical respects: (1) the student is denied the right to have experienced legal counsel conduct his defense and cross-examine witnesses; and (2) the student is denied the right to have the hearing subject to the traditional rules of evidence. Assuming Henson had a protectable liberty or property interest in the Honor Code proceeding, we conclude that the procedural protections afforded him were sufficient under the fourteenth amendment's due process clause.

The University's Honor System provides the accused student with an impressive array of procedural protections. The student, for example, receives what is essentially an indictment, specifying both the charges and the factual allegations supporting them. *Virginia Honor Code,* Art. III, § C(4). He has a right to a hearing before a committee of his peers. He is entitled, at no personal cost, to have a student-lawyer represent his interests at all critical stages in the proceedings. He may also retain a practicing attorney to assist in his defense, although the attorney can assume no active role in the Honor trial itself. *Id.* at Art. III § C(1). The individuals who brought the charges must face the student at the hearing and state the basis of their allegations. *Id.* at Art. III § D(2). They, in turn, must submit to cross-examination by the student, or his designated student counsel, and by the members of the hearing committee. The student then has the right to present evidence in opposition to the charges and to offer witnesses for the sole purpose of bolstering his character. *Id.* at Art. III § D(5)(a). He may, if he chooses, demand that the hearing be conducted in public, where impartial observers can make an independent assessment of the proceeding's fairness. *Id.* at Art. VIII § E. If, after hearing the evidence, four-fifths (⅘) of the committee members find the student guilty beyond a reasonable doubt, he has the right to appeal the decision to a five-member board comprised of members of the student government. *Id.* at Art. V. This board is empowered to review the record of the Honor trial and to grant new trials when, in its judgment, the correct procedures were not followed or the evidentiary findings of the trial committee were deficient.

In some respects, these procedures concededly fall short of the stringent protections afforded the criminal defendant; that is not, however, a defect of constitutional dimension. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Board of Curators v. Horowitz,* 435 U.S. 78, 102, 98 S.Ct. 948, 961, 55 L.Ed.2d 124 (1978) (quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). The Supreme Court has made it plain that "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances. The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the

case against him and opportunity to meet it.'" *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) (quoting *Joint Anti-Fascist Commission v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (1951)). In the academic setting particularly, the Supreme Court has recognized that the requirements of due process may be satisfied by something less than a trial-like proceeding. *See Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

The decision in *Board of Curators v. Horowitz, supra,* is instructive on this point. In *Horowitz,* a medical student was denied permission to graduate after several tiers of evaluators concluded she did not possess the requisite skills to perform surgery. The student was never given a formal hearing to rebut the charges of incompetence, but the Supreme Court nonetheless found no violation of due process. "A school," the Court noted, "is an academic institution, not a courtroom or administrative hearing room." *Horowitz,* 435 U.S. at 88, 98 S.Ct. at 954. It must, therefore, have greater flexibility in fulfilling the dictates of due process than a court or an administrative agency. The Court further explained that when the school's procedures permit a meaningful exchange between officials and student, and are designed to safeguard against an erroneous evaluation of the student's skills, judicial intrusion into academic decisionmaking should be avoided.

■ *Horowitz,* of course, involved the school's prerogatives in evaluating the academic fitness of a student. The Court was careful to distinguish this situation from a case in which the student faced disciplinary charges stemming from "the violation . . . of valid rules of conduct." *Horowitz,* 435 U.S. at 86, 98 S.Ct. at 953. The clear implication of *Horowitz* is that disciplinary proceedings require more stringent procedural protection than academic evaluations, even though the effects of an adverse decision on the student may be the same. Labeling a school proceeding disciplinary in nature, however, does not mean that complete adherence to the judicial model of decision-making is required. *See Goss v. Lopez, supra.* There are numerous instances in which courts have permitted variations on the "trial model" in differing settings even though individual interests of significant importance were at risk. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see also Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Wimmer v. Lehman,* 705 F.2d 1402 (4th Cir.1983); *Dixon v. Alabama State Board of Education,* 294 F.2d 150, 159 (5th Cir.1961). Although *Dixon* was decided more than twenty years ago, its summary of minimum due process requirements for disciplinary hearings in an academic setting is still accurate today.

In the instant case, Henson's personal stake in the Honor Code proceedings was substantial. The Honor Committee had the power to end his academic affiliation with the University and possibly to jeopardize his entry into the legal profession. The procedural steps the University employed in Henson's disciplinary case, however, were constitutionally sufficient to safeguard his interest from an erroneous or arbitrary decision. Henson had adequate notice of the charges against him and the opportunity to be heard by disinterested parties. He also was confronted by his accusers and given the right to have a record of the hearing reviewed by a student appellate body. It is true that Henson was not permitted to have a practicing attorney conduct his defense, but this is not a right generally available to students facing disciplinary charges. *Gabrilowitz v. Newman,* 582 F.2d 100, 104 (1st Cir.1978). Henson was provided with two student-lawyers who consulted extensively with his personally retained attorney at all critical stages of the proceedings. The due process clause would impose no greater obligations on the University than it placed on itself in conducting its disciplinary proceedings. *Dixon v. Alabama, supra.*

We do not suggest that the procedures for judging Honor Code violations at the University of Virginia represent a model for assuring constitutional due process in all administrative settings. The designed pro-

cedures, however, withstand constitutional condemnation upon facial attack. Since the record establishes that these constitutionally valid procedures were followed by the Honor Committee in Henson's case, he was not denied due process of law.

AFFIRMED.