Lesia **HERRON**, Plaintiff,

v.

**VIRGINIA COMMONWEALTH UNIVERSITY, Defendant.**

No. CIV.A. 3:03CV590.

United States District Court,
E.D. Virginia,
Richmond Division.

April 29, 2004.

356

Steven Bennett Gould, Bethesda, MD, for Plaintiff.

David Lee Ross, Pamela Finley Boston Richmond, VA, for Defendant.

## MEMORANDUM OPINION

DOHNAL, United States Magistrate Judge.

This matter is before the court on several pending motions: (1) Plaintiff's Motion for Leave to File a First Amended Complaint (Pl.'s Mot. First Am. Compl.); (2) Plaintiff's Motion for Leave to File a Second Amended Complaint (Pl.'s Mot. Second Am. Compl.); (3) Defendant Virginia Commonwealth University's Motion for Summary Judgment (Def.'s Mot. Summ. J.); (4) Plaintiff's Motion for Partial Summary Judgment (Pl.'s Mot. Partial Summ. J.); and (5) Defendant's Objections and Motion to Strike Plaintiff's Expert Designation (Def.'s Mot. Strike Expert).[1] The court has reviewed the pleadings and entertained oral argument; therefore, the matter is ready for resolution.

For the reasons set forth herein, Plaintiff's motions for leave to amend are DENIED and the Defendant Virginia Commonwealth University's (VCU) motion for summary judgment is GRANTED, all remaining motions being DENIED as moot.

### Plaintiff's Motions for Leave to Amend

Leave to amend shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). In two separate motions for leave to amend, Plaintiff seeks to add a new claim, a new party, and new factual assertions. The Defendant argues that despite the liberal amendment rules, the court is constrained to deny leave where a proposed amendment would be futile. *Roper v. County of Chesterfield,* 807 F.Supp. 1221 (E.D.Va.1992). In this case, even when considered in the light most favorable to the Plaintiff, the proposed amendments would not form the basis of recovery and therefore leave to amend is not warranted.

In her original complaint, Plaintiff asserts that she was terminated[2] as a student in the Defendant's nurse anesthetist program based on her race in violation of her civil rights and in breach of the Defendant's contract with all students to abide by various policies and procedures as set forth in a student handbook. (Compl. ¶¶ 15–19). More specifically, Plaintiff asserts she was subjected to an academic review panel hearing without consideration of lesser alternatives that had been afforded other non-minority students similarly-situated; that she was not given advance written notice of the issues to be considered by the panel as required by the procedure set forth in the handbook; and that she was forced to resign thereafter when the decisionmaker told her of his intention to follow the panel's recommendation of termination. *Id;* (Pl.'s Mem. P. & A. in Supp. Mot. Summ. J. at 9, ¶ 28).

In her first motion for leave to amend the original complaint, Plaintiff seeks to add the claim that she was denied her constitutional right of due process by the failure of the Defendant's agents to formally advise her of the administrative charges against her in advance of the hearing as a required procedure for such proceedings. The Defendant objects to the proposed amendment as futile where the Defendant is not a "person" subject to

---

1. Although not filed in this sequence, the court deems it most logical to address the several motions in this order where, for example, the Defendant's Motion for Summary Judgment was filed in regard to the original Complaint and would be impacted if leave is granted to amend the allegations.

2. Although not pled in the original complaint, there is no dispute that the evidence of record and the amended complaints show that Plaintiff resigned from the program. Plaintiff claims that she was constructively discharged while Defendant maintains that it allowed her to voluntarily resign instead of suffering the brand of termination from the program.

liability in the § 1983 action asserted, and because of the Defendant's immunity from suit without its consent as an agency of a sovereign state. (Opp'n to Mot. Leave File First Am. Compl.). The Defendant also asserts that the motion should be denied because the additional factual averments that are the basis of the proposed amendments had to have been within the knowledge of the Plaintiff when the original complaint was filed and that the failure to plead them at that juncture and the resulting delay cannot be excused. *Id.*

In her Motion for Leave to File a Second Amended Complaint, the Plaintiff seeks to address the argument raised by the Defendant that it is not a "person"[3] susceptible to suit by adding the individual decisionmaker involved (Dr. Fallacaro) as a defendant in both his official and individual capacities. (Pl.'s Mot. Second Am. Compl.).[4] The Plaintiff also asserts that the potential individual liability of the decisionmaker was only developed during ongoing discovery and that the basic underlying facts involved remain the same so that the Defendant cannot claim prejudice. *Id.* In response, the Defendant reiterates its earlier arguments in opposition to the Plaintiff's first motion to amend, adding that not only was the proposed amendment made on the eve of trial so as to be unduly prejudicial, especially where the proposed additional party has not had the opportunity to conduct his own discovery with his own counsel, but the proposed amendment would also be futile because the acts complained of were allegedly committed by yet a different individual agent of the Defen-

dant involved in the process (Dr. Reese). (Opp'n to Mot. Leave to File Second Am. Compl.).[5] In addition, the Defendant asserts that no facts are alleged in either the original complaint or the proposed amended version(s) that could constitute a theory that Plaintiff was terminated by constructive discharge as is necessary as a matter of law to sustain the claim that she was denied her constitutional and/or statutory right(s) to due process. *Id.*

In order to determine whether the Plaintiff's proposed amendments would be futile, the court must determine whether the new facts adequately state a cognizable claim. Here, Plaintiff alleges a Fourteenth Amendment Due Process violation because she received inadequate notice of the charges against her. To state a due process claim, the Plaintiff must show that she had: (1) a protected liberty or property interest; (2) of which the Defendant deprived her; (2) without due process. *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Supreme Court has held that academic dismissals implicate a student's liberty or property interests and are thereby protected by the due process guarantee of the Fourteenth Amendment. *Goss v. Lopez,* 419 U.S. 565, 573, 95 S.Ct. 729, 42 L.Ed.2d 725 (citing *Roth,* 408 U.S. at 577, 92 S.Ct. 2701). However, the Supreme Court has drawn a distinction as to the nature and extent of the procedural safeguards required before an academic institution takes adverse action based on academic performance as opposed to disciplinary charges.

---

3. At the same time, the Plaintiff argues that the Defendant is a "person" within the ambit of the statutory scheme because it would be subject to any injunctive relief as may be ordered as part of the relief sought. *Id.*

4. Plaintiff has tendered the proposed Second Amended Complaint which will be made part of the record as an exhibit to the motion.

5. Trial proceedings were stayed following oral argument to allow sufficient time for resolution of the pending motions without the parties having to incur the additional time and expense of continued preparation for a trial that may not occur.

The Court has held that academic dismissals require only "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Bd. of Curators of the Univ. of Missouri v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)(citing *Goss,* 419 U.S. at 584, 95 S.Ct. 729).[6]

■ Plaintiff argues that because she was dismissed for disciplinary as well as academic reasons, the Defendant was required to provide her with the more stringent procedural safeguards for disciplinary dismissals. *See Henson v. Honor Comm. of Univ. Virginia,* 719 F.2d 69, 74 (4th Cir.1983)(holding that a student's dismissal for disciplinary rather than academic reasons required a more stringent procedural protection.) However, here, the adverse actions all derived from Plaintiff's academic performance as a student nurse anesthetist in a clinical setting and not from any disciplinary charge of the nature to warrant a more stringent standard. The evidence discloses without meaningful refutation that the Plaintiff was unable to perform basic but crucial tasks such as understanding and creating anesthesia plans, operating equipment that measures a patient's vital signs, performing patient intubation, and monitoring patient safety during procedures. (Def.'s Br. Supp. Mot. Summ. J.)(Def.'s Mem.)(Affs. of Nancy Stelling ¶¶ 6–8; Michelle Grant ¶¶ 6–7; Kathy Baker ¶¶ 5, 8–9; Wendy Vokac ¶¶ 5–8; Michelle Minta ¶¶ 5–9; Donna Ells

¶¶ 6–10; Charles Gould ¶ 4; George Bugbee ¶¶ 6—10, 12; Sandra L. Barnes ¶¶ 2–3; Kirk Willis Tanner ¶ 2; Joanne Leslie Fletcher ¶¶ 2–3; James P. Embrey ¶¶ 3, 5–9; Michael Fallacaro ¶¶ 11, 13–17, 22, 24; Charles Reese ¶¶ 30–37, 39–40). The evidence presented also demonstrates that instructors and clinical supervisors consistently perceived that Plaintiff was unable to accept or integrate instruction or criticism into her clinical performance and that she genuinely displayed a poor attitude. (Def.'s Mem.)(Affs. Grant ¶¶ 4, 6,7.8; Baker ¶¶ 5–6;Vokac ¶ 8; Minta ¶¶ 8–9; Ells ¶¶ 4, 10–11; Bugbee ¶¶ 6,7, 10; Barnes ¶¶ 2–3; Tanner ¶ 2; Fletcher ¶¶ 2–3; Embrey ¶¶ 5–9; Fallacaro ¶¶ 17, 19, 28, and attached exs; Reese ¶¶ 36, 38, 44, 54). The Defendant maintains that it was primarily concerned with patient safety when assessing Plaintiff's progress and that even though the main reason for such concern was Plaintiff's lack of skill, her poor attitude that included an air of combativeness when confronted with instruction also contributed to the problem. (Def.'s Mem. at 28). The Plaintiff argues that such assertions are demonstrative of disciplinary action, not academic dismissal, and that the unprofessional behavior recounted by Defendant's witnesses was simply a misunderstanding. (Pl.'s Opp'n to Def.'s Mot. Summ. J. at 23–25).

The Plaintiff was enrolled in a professional degree program that required the student to master hands-on medical skills coextensive with the academic component of study. In this case, the Plaintiff is more like the plaintiff in *Horowitz* who, in the

---

**6.** Although a scenario involving academic dismissal was before the Supreme Court in *Horowitz,* the Court chose not to address the issue directly, instead holding that *if* there was a due process right involved, the respondent-student had been afforded sufficient due process. This court has difficulty with the concept that a student has a formal due process right guaranteed by the Constitution to challenge a dismissal for academic reasons, rather than just disciplinary issues having such protection. However, there is no published guidance from the Fourth Circuit precisely on point and the court must therefore defer to the precedent of other circuits for purposes of this analysis.

opinion of the academic decisionmakers, would not be able to advance in the program to become a medical doctor because she could not competently perform the clinical aspects ("hands-on") of a nurse anesthetist. 435 U.S. at 81, 98 S.Ct. 948 (holding that failure to perform in the clinical setting was part of the student's academic performance). In contrast, cases where students were disciplined and afforded a broader range of due process protection involved misconduct of a non-academic nature. For instance, in *Henson*, although the student had been expelled for academic reasons, he also had been subject to disciplinary charges that he had stolen a problem set. 719 F.2d at 74. Stealing is the type of misconduct readily distinguishable from failure to perform in a clinical setting—even when it is alleged that the student's bad attitude, unpleasant personality, or unprofessional behavior exacerbated the academic problem or prevented the student from correcting her clinical deficiencies.[7] Accordingly, the court concludes that the Plaintiff did not have to be afforded the more expansive range of procedural due process as would attend disciplinary proceedings.

In addition, as to Plaintiff's complaint that there was lack of adequate notice in advance, there is ample evidence of record to the effect that even though Plaintiff was not provided with formal, written notice of the issues to be discussed at the review panel hearing, she was apprised of the concerns by continuous counseling sessions during which adverse progress reports dealing with all the issues upon which the ultimate recommendation for termination was based were disclosed and discussed with her. (Def.'s Mem. ¶¶ 6, 9, 12, 15–20, 26–30, 33–34, 36–38, 41–43)(citing affidavits of Stelling ¶¶ 5–8; Baker ¶¶ 4–6; Fallacaro ¶¶ 11, 15—17; Minta ¶¶ 4–9; Bugbee ¶¶ 7–11; Barnes ¶¶ 1–3; Tanner ¶¶ 1–3; Fletcher ¶¶ 1–3; Embrey ¶¶ 1, 3, 5, 6, 8–9). Furthermore, Plaintiff was afforded a hearing in which "the Committee listened to Herron's oral comments, asked questions of Herron, and listened to her answers." *Id.* ¶ 44 (citing consistent affidavits of Drs. Reese, Fallacaro and Hartland). In *Horowitz*, a medical student's academic dismissal was upheld even though she was provided neither a hearing nor any formal notice of her deficiencies. 435 U.S. at 86, 98 S.Ct. 948. Instead, the student was informed of her academic issues in the same essential way as the Plaintiff here—through ongoing counseling and critique. In this case, the deliberative process that the Defendant used to evaluate and inform the Plaintiff about her academic and clinical deficiencies was the functional equivalent to that which the Supreme Court approved in *Horowitz* as being more than sufficient to comply with constitutional due process requirements. *Id.* Therefore, the Plaintiff received the process required for academic dismissals and any amendment of the complaint to add a due process claim would be futile.

█ At the same time, if there were a viable due process claim, it could not lie against the party Plaintiff seeks to name

---

**7.** Misconduct subject to disciplinary action can be distinguished from failure to attain the required standard in a program of study. *Horowitz*, 435 U.S. at 88, 98 S.Ct. 948; *see, e.g., Lewin v. Med. Coll. of Hampton Roads*, 910 F.Supp. 1161, 1165 (E.D.Va.1996)(holding that the decision to terminate a medical student was an academic dismissal even where evidence of honor code violations was considered); *Cobb v. Rector & Visitors of Univ. of Virginia*, 84 F.Supp.2d 740, (W.D.Va.2000)(holding that expulsion for cheating, a violation of the honor code, is a disciplinary matter); *Goad v. Silverman*, 121 F.3d 698, 1997 WL 543380, at *2 (4th Cir.1997)(unpublished)(sexual misconduct by a resident is a disciplinary matter).

as an additional defendant. In order for her to ultimately prevail on the proposed due process claim against the individual decisionmaker, Dr. Fallacaro, Plaintiff must show that Dr. Fallacaro was not engaged in the performance of discretionary duties and that the his actions violated Plaintiff's "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, if the contours of the constitutional right asserted are not sufficiently clear, the defending state actor has an absolute defense of qualified immunity. *Buonocore v. Harris,* 65 F.3d 347, 353 (4th Cir.1995). Moreover, even if a clearly-established constitutional right is implicated, a defense of qualified immunity may still apply if it was objectively reasonable for the state actor to believe that the conduct was lawful under the circumstances. *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Here, the only clearly established right that could be asserted by the Plaintiff is that she was entitled by virtue of the student handbook to the utilization of a certain procedure if she was going to be subject to adverse action.

It can be fairly argued that the Defendant's student handbook created various contractual obligations on both its part as well as the Plaintiff's. *Lewin,* 910 F.Supp. at 1164. However, although the Plaintiff has raised a compelling analogy between dismissals in the academic setting and dismissals in the employment context, it cannot be said—or fairly concluded—that a breach of those contractual obligations as may be created by the student handbook rise to the level of a *clearly established constitutional deprivation* necessary to sustain the Plaintiff's due process claim. The constitutional right potentially implicated is not simply that of due process in the abstract sense of a "liberty" or "prop-

erty" interest; rather, it is whether the failure to follow all of the prescribed procedures of the student handbook related to academic standing violates such fundamental rights as to invoke the protection of the Constitution:

> To determine whether a federal right was clearly established at the time of the defendant's alleged conduct, we focus 'not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.'

*Zepp v. Rehrmann,* 79 F.3d 381, 385 (4th Cir.1996)(citing *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992)).

As already discussed, there is firm authority setting forth the required process for protecting Plaintiff's presumed liberty or property interest in continuing with her studies. However, even if there were a clearly established constitutional right to some specific process based on the student handbook, there is ample, un-refuted evidence that the decisionmaker here had a good faith and reasonable belief that his actions were not violative of the Plaintiff's constitutional rights. (Def.'s Mem. at 18)(Fallacaro aff. ¶ 30).

Moreover, the acts enumerated in the Complaint that are incorporated in the proposed amendments, as well as the undisputed evidence of record, are all attributable to individuals other than Dr. Fallacaro, the ultimate decisionmaker. In addition, even though the Plaintiff seeks to join Dr. Fallacaro as a party, she does not assert that as the decisionmaker he was even aware that she did not receive a formal notice of the charges against her. Finally, as conceded by Plaintiff's counsel at oral argument, there is absolutely no factual basis to assert that Dr. Fallacaro was motivated by racial animus in his decision to adopt the recommenda-

tion for Plaintiff's dismissal from the program; nevertheless, the proposed Second Amended Complaint (Count Three) seeks to hold him personally liable for racial discrimination. (Pl.'s Mot. Second Am. Compl. & Proposed Am. Compl.).

In fact, the proposed Second Amended Complaint does not include any specific factual averments regarding Dr. Fallacaro's actions as the ultimate decisionmaker. Instead, the proposed additional claims simply re-allege the general allegations of the original complaint and presumably seek to add the decisionmaker on the basis that "he must have known or should have known." Such a "shotgun" approach is not sufficient or acceptable and the court is not inclined to permit yet a third attempt at amendment, especially in light of counsel's candid, albeit necessary, representations at oral argument that there is no evidence concerning racial animus on Dr. Fallacaro's part. Accordingly, where adding the proposed party in his official capacity as the surrogate of the state agency involved would be to no avail because the doctrines of sovereign immunity (as discussed later herein) and/or qualified immunity bar any recovery against the state and its "actors" in their official capacities; and where there is no factual predicate alleged or of record sufficient to engender individual liability or refute a defense of qualified immunity so as to allow for even injunctive relief as well as attorney's fees and costs as a prevailing party, the proposed amendments are indeed futile and the respective motions to amend must therefore be denied.

### Defendant's Motion for Summary Judgment

The Defendant has moved for summary judgment as to all claims on the combined basis of its sovereign immunity as an agency or instrumentality of the state and the certain failure of the Plaintiff, based on the undisputed facts, to be able to establish even a *prima facie* case of racial discrimination. (Def.'s Mem.) [8] The Defendant initially raised the doctrine of sovereign immunity as a potential defense in its Answer to the original Complaint, but it has only specifically asserted it of late as a bar to the claims set forth in Count Two (§ 1983 racial discrimination claim), Count Three (§ 1981 racial discrimination claim for violation of contract rights), and Count Four (pendent state claim for breach of contract). The Plaintiff argues that the Defendant's "litigation conduct" in failing to assert the defense by a motion to dismiss before engaging "in very extensive discovery" constitutes a waiver of any right to do so now. (Pl.'s Opp'n to Def.'s Mot. Summ. J. at 28–29)(Pl.'s Opp'n).

Even though it would have been more expeditious to raise the defense earlier in the litigation, the defense of sovereign immunity can be raised at any time,

---

**8.** The standard for granting summary judgment is well-established. Summary judgment is only to be granted when there is no genuine dispute as to any issue of material fact when all justifiable inferences are drawn in favor of the non-moving party and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, unsupported conclusory allegations by the non-moving party are not sufficient to create a genuine dispute of material fact so as to withstand the granting of relief. *Celotex Corp. v. Catrett,* 477 U.S. at 327, 106 S.Ct. 2548 (White, J., concurring). In essence, the court must decide if the evidence when viewed in the light most favorable to the non-moving party "presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251–52, 106 S.Ct. 2505.

even on appeal, at least where there is no basis to conclude that the state took any affirmative action other than pre-trial preparation so as to constitute a binding waiver of the defense. By contrast, the authority relied on by the Plaintiff on this issue is distinguishable by virtue of the particular procedural circumstances involved in each case cited. *See, e.g., Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998). For example, the defense was first raised *during* trial in *Hill v. Blind Indus. & Servs. Maryland*, 179 F.3d 754 (9th Cir.1999), and in a motion to stay by the state *pending appeal* of an adverse ruling on summary judgment in *Ku v. Tennessee*, 322 F.3d 431 (6th Cir.2003).[9] Even though there is precedent for the proposition that affirmative efforts by a state to defend itself on the merits of a claim can constitute a waiver of its Eleventh Amendment immunity, such authority also holds that the intention must be unequivocal. *See, e.g., Neinast v. Texas*, 217 F.3d 275, 279 (5th Cir.2000) ("[a] state's waiver of immunity must be unequivocal").[10] Here, the Defendant included sovereign immunity as

a defense in its Answer to the original Complaint and, indeed, the Plaintiff acknowledged in her Complaint that the Defendant "is an instrumentality of the Commonwealth of Virginia" so that the Plaintiff can hardly claim surprise. (Compl.¶ 4). Additionally, although belatedly, the defense has been asserted before trial, let alone before any ruling on a dispositive motion or on appeal. Such circumstances preclude a finding of an unequivocal waiver of such a fundamental defense. Therefore, the questions that remain are whether sovereign immunity is properly invoked and, if so, how does it affect the claims raised in the Complaint?

■■■ As one court has stated: "The Eleventh Amendment secures the states' immunity from private suits for monetary damages filed in federal court." *Neinast*, 217 F.3d at 280. At the same time, Congress can abrogate the immunity in certain areas such as Titles VI and VII of the Civil Rights Act, of which Title VI is the basis for the claim in Count One.[11] However, Congress has not abrogated Eleventh Amendment immunity in regard to claims

---

9. Plaintiff's reliance on additional authority is likewise unavailing. Specifically, Plaintiff cites *In re SDDS, Inc.*, 225 F.3d 970 (8th Cir.2000), where the defendant state attempted to invoke a sovereign immunity defense for the first time following remand from the court of appeals. In *Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Auth.*, 744 F.2d 880, (1st Cir.1984), the defendant was deemed to have waived the sovereign immunity defense (even assuming it was a state entity as questioned by the court) by having first raised it on appeal after actively pursuing a counterclaim and third-party action through trial. Finally, the state entity in *New Hampshire v. U.S. Dep't of Ed.*, 2003 WL 1701322 (D.N.H.2003), also relied on by Plaintiff, was deemed to have waived any sovereign immunity defense when it only sought to invoke it after voluntarily submitting to arbitration and then initiating suit in federal court to contest the adverse decision.

10. *See also Ku*, 322 F.3d at 433–434 (citing additional cases demonstrating that waiver of Eleventh Amendment defense was based on more overt action by the state than is present here).

11. Eleventh Amendment immunity does not reach to non-monetary, prospective injunctive relief or the fees and costs involved in obtaining such relief. *Gray v. Laws*, 51 F.3d 426, 430 n.1 (4th Cir.1995)(citing *Edelman v. Jordan*, 415 U.S. 651, 664–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) for the proposition that a claim for prospective injunctive relief may proceed even when damages claims are dismissed based on immunity); *Hutto v. Finney*, 437 U.S. 678, 694, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)(discussing the historical support for awarding fees and costs irrespective of Eleventh Amendment immunity from money damages).

brought pursuant to 42 U.S.C. §§ 1981 and 1983 and, therefore, where "state colleges and universities are agents of the state," the claims against the Defendant as a state agency or instrumentality in Count Two (§ 1983) and Count Three (§ 1981) must be dismissed. The immunity also extends to Dr. Fallacaro in his official capacity because the claim against him is still considered an action against the state. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Demuren v. Old Dominion Univ.,* 33 F.Supp.2d 469, 475 (E.D.Va.1999).

The Defendant also argues that the Eleventh Amendment and/or state law bars any claim against the state that is premised on a pendent cause of action such as breach of contract as is the basis for Count Four. (Def.'s Mem. at 21–22; VCU's Rebuttal Herron's Opp'n VCU's Mot. Summ. J. at 18–20)(Def.'s Rebuttal). Whether or not the Eleventh Amendment's prohibition against the exercise of "[t]he judicial power of the United States" extends to a pendent state claim, or whether sovereign immunity still attends in any event based on state law, the court chooses not to invoke its supplementary jurisdiction to consider what would be the only remaining claim if, for no other reason, than the conclusion that it would be more appropriate for the state courts to resolve the matter.[12] For example, there is the particular question of state law as to whether the Plaintiff satisfied all administrative requirements that would preclude the Defendant's claim of immunity for failure to follow the prescribed administrative process in a breach of contract claim.

The sole remaining issue involved in the resolution of the Defendant's Motion for Summary Judgment is whether there is a genuine issue of disputed material fact in regard to the claim in Count One that Plaintiff was discriminated against based on race. In order to prevail without direct evidence of discrimination, Plaintiff must first present a *prima facie* case establishing that (1) she is a member of a protected class; (2) she suffered an adverse action; (3) she was qualified or otherwise meeting legitimate expectations for continued enrollment; and (4) her dismissal occurred under circumstances giving rise to the inference of unlawful discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Taylor v. Virginia Union Univ.,* 193 F.3d 219, 230 (4th Cir.1999). In this case, the only undisputed factor is that the Plaintiff was a member of a protected class. Regarding the second element, Plaintiff claims she was terminated by way of constructive discharge which constitutes an adverse action. (Pl.'s Opp'n Def.'s Mot. Summ. J. at 13)(Pl.'s Opp'n). The Defendant argues that the Plaintiff was not terminated or constructively discharged; rather, she received a beneficial option to resign from the program to avoid failing grades as well as the stigma attached to an official dismissal. (Def.'s Mem. at 24–25; Def.'s Rebuttal at 3–5). With respect to the third element, the Defendant has produced voluminous evidence that Plaintiff was not performing at an acceptable

---

**12.** It is within the court's discretion to decline to exercise jurisdiction over the state claims when federal claims have been dismissed. 28 U.S.C. § 1367. On this issue, the Fourth Circuit has held that dismissal of a pendent claim is permissive rather than mandatory and is based on a discretionary determination. *Davis v. Pak,* 856 F.2d 648, 651 (4th Cir.1988). Courts have viewed various factors favoring retention: whether the case has been pending for a long time or is approaching trial; whether the state claim may be decided as a matter of law; whether state law claims may be time-barred; and whether forum shopping is evident. The court concludes that none of these considerations, even if present here to some degree, justify retention of the issue for resolution by this court.

level. As to the final element, the Plaintiff attempts to show that even though she may have had some performance problems, she was subjected to disparate treatment demonstrating that she was treated more severely than those under comparable circumstances who were outside the protected class. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 767, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). If a plaintiff is able to establish a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason or reasons for terminating the plaintiff. *Texas Dept' of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant has met this burden, the plaintiff can offer evidence that the proffered reason is in fact a pretext for actual discriminatory motive. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

In *Stone v. Univ. of Maryland Med. Sys. Corp.,* 855 F.2d 167, 174 (4th Cir. 1988), the court held that a resignation may constitute actionable constructive discharge under a so-called "duress/coercion" theory based on an analysis of all the circumstances to determine if "the [defendant's] conduct in requesting resignation effectively deprived the [plaintiff] of free choice in the matter." [13] The test is necessarily fact-driven with particular circumstances attending each situation. The essential, unrefuted evidence is as to Plaintiff's "departure" is as follows:

1. Dr. Michael D. Fallacaro, the ultimate decisionmaker, met with the Plaintiff in his office on March 21, 2002, for the purpose of informing her of his decision to accept the review panel's recommendation that she be "withdrawn" from the program. (Def.'s Mem., Fallacaro aff. ¶ 30, attached as ex. 13, Letter from Hartland to Fallacaro of 3/20/2002).

2. The Plaintiff's academic advisor (Ms. Melissa Hotchkiss) was present when Dr. Fallacaro presented a copy of the findings and recommendation of the review panel to the Plaintiff. *Id.*

3. Dr. Fallacaro also read the proposed letter of termination he had drafted to the Plaintiff and confirmed that she understood both. (Def.'s Mem.; Letter from Fallacarro to Herron of 3/21/2002).

4. Dr. Fallacaro informed Plaintiff of her right to appeal the decision and offered her the opportunity to voluntarily resign in lieu of termination. *Id.*

5. Withdrawal or resignation would have benefitted Plaintiff by preventing any indication of termination on her academic record. (Def.'s Mem., Fallacaro aff. ¶¶ 33–34).

6. Dr. Fallacaro informed Plaintiff that if she wanted to withdraw, she had to provide notice of same within twenty-four hours as required by procedure and that he would withhold issuing the letter of termination in the meantime. *Id.*

7. The Plaintiff contacted Dr. Fallacaro within twenty-four hours and inquired about the possibility of having any withdrawal apply retroactively so as to avoid failing grades in current courses. (Def.'s Mem., Fallacaro aff. ¶¶ 31).

---

**13.** The court in *Stone* also articulated another basis for establishing constructive discharge, namely, resignation obtained by misrepresentation or deception. 855 F.2d at 174. However, such elements are not alleged here and therefore the issue is not addressed.

8. Dr. Fallacaro responded that such an action would require good cause whereupon Plaintiff recited her personal circumstances that Dr. Fallacaro stated he would recommend as justification for the request. *Id.*

9. The Plaintiff asked to consider the situation over the ensuing weekend in response to which Dr. Fallacaro reiterated the requirement that the Dean of the Department involved had to be notified within twenty-four hours, whereupon the Plaintiff stated she wished to withdraw as had been proposed. *Id.*

10. The Plaintiff submitted a formal letter of withdrawal stating that she was doing so "due to personal circumstances." (Def.'s Mem., Fallacaro aff. ¶¶ 32).

11. Dr. Fallacaro forwarded Plaintiff's letter to the Dean for final approval together with required forms to effectuate the retroactive withdrawal option.

12. At some point in the process, the Plaintiff conferred with the Director of Student Services for the Defendant (Ms. Monica White) and discussed the possibility of program withdrawal rather than termination, given the particular personal circumstances of her situation which she also related. (Def.'s Mem., White aff. ¶ 4, attached as ex. 14).

13. Plaintiff's request to withdraw and to have it apply retroactively so as

to preclude any failing grade was approved. (Def.'s Mem.; Fallacaro aff. ¶ 34).

In *Stone*, a surgeon employed by a state agency resigned after negotiating terms upon being told that he would be terminated if he didn't resign. However, the court held that:

> [T]he mere fact that the choice is between comparably unpleasant alternatives—e.g., resignation or facing disciplinary charges—does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary. This is so even where the only alternative to resignation is facing possible termination for cause, unless the employer actually lacked good cause to believe that grounds for termination existed.

855 F.2d at 174 (citations omitted).[14]

█ Here, Plaintiff was given an option even before that of voluntary withdrawal, namely, administrative appeal from the decision to terminate. In addition, she had the time and opportunity to confer with at least another administrative source than the decisionmaker before making her decision to withdraw. Perhaps most significantly, she successfully negotiated a better benefit than first proposed in the form of a retroactive withdrawal that precluded any failing grade notation on her academic record. Such circumstances appear substantially similar to those in *Stone* in which, in fact, there was less than an unanimous recommendation—as there was here—for termination.[15]

---

14. Although this court, in a different context, opined earlier in the case that it could be reasonably inferred that the Plaintiff was compelled to withdraw so as to constitute constructive discharge, the court did not have the benefit of a full review of the record, nor had it considered the *Stone* analysis.

15. Case precedent subsequent to *Stone* offers no better support for Plaintiff's position. For example, in *Zepp v. Rehrmann*, 79 F.3d 381 (4th Cir.1996), the court, citing *Stone*, noted that the plaintiff's level of experience and sophistication combined with his successful negotiation of "significant concessions" demonstrated the voluntariness of his decision to

The authority relied on by Plaintiff to argue that she did suffer an adverse action of constructive discharge is of no avail because of factual circumstances that, in fact, compel the opposite conclusion, aside from the fact that the *Stone* precedent, as the controlling standard, is not addressed in Plaintiff's supporting memoranda. (Pl.'s Mem. at 13–14). First, the court in *Beye v. Bureau of Nat'l Affairs*, cited by Plaintiff, held in an employment context that the claimant's working conditions were not so intolerable as to justify his refusal to work which was the basis for proposed dismissal. 59 Md.App. 642, 477 A.2d 1197 (1984). Similarly, in *Pollard v. High's of Baltimore, Inc.*, the court held that the employer's reassignment of the employee to less physically demanding responsibilities in order to accommodate her condition following surgery did not compel her subsequent resignation. 281 F.3d 462 (4th Cir.2002). The court in *Fowler v. Carrollton Pub. Library* affirmed the concept of constructive discharge as a possible basis for a § 1983 claim, but held that it was error for the concept to be presented to the jury in a special interrogatory along with the concept of actual discharge for cause. 799 F.2d 976, 981 (5th Cir.1986). The court in *Matvia v. Bald Head Island Mgmt., Inc.*, also relied on by Plaintiff, held that the employer did not create intolerable working conditions for the plaintiff so as to force her resignation because it took reasonable steps to address issues of co-worker lack of civility toward the plaintiff, and it had legitimate reasons for pro-

moting someone other than plaintiff into a particular position as well as taking disciplinary action against her for falsifying time records. 259 F.3d 261, 272–273 (4th Cir.2001). Finally, in *EEOC v. Univ. of Chicago Hosps.*, the court did find sufficient *prima facie* evidence of constructive discharge, but the actions of the employer included, for example, significant changes in plaintiff's evaluations combined with the termination of co-workers and the stated intention to do likewise to plaintiff as well as "a general environment in which [employer] was hostile to [plaintiff's] religious beliefs." 276 F.3d 326, 332 (7th Cir.2002). None of the circumstances in these cases or others reviewed by the court approach those in *Stone* or this case.

■ Even though the analysis may end at this point for the Plaintiff's failure to establish even a *prima facie* case, it is deemed appropriate to continue for possible review and so that the Plaintiff has a clear understanding of the controlling law required for establishing a *prima facie* case. In this regard, if the only issue is whether Plaintiff was meeting the legitimate expectations of the program at the time of her departure, she might be able to survive summary judgment because of what can be argued to be conflicting evidence in the record. However, not only does the Plaintiff fail to show that she suffered an adverse action, she also fails to show that the dismissal gives rise to an inference of unlawful discrimination. Indeed, there is ample, unrefuted evidence to

resign within only hours of being confronted with an ultimatum of resignation or termination. Similarly, in *Blue v. Etheridge*, 1994 WL 273399 (E.D.N.C.), the court again relying on *Stone*, found that the plaintiff was not constructively discharged when she was confronted with the "unpleasant alternative" of resignation versus termination where she, as the Plaintiff here, was presented with a written report of the basis for the proposed action

and otherwise advised of the allegations involved. Such circumstances are to be distinguished, for example, from such coercive elements as in *Angarita v. St. Louis Co.*, 981 F.2d 1537 (8th Cir.1992), in which the claimants were told they could not leave during an interrogation of them regarding allegations of misconduct unless they resigned then and there.

substantiate the Defendant's explanation of non-discriminatory reasons for the proposed termination of Plaintiff's participation in the program. (Def.'s Mem. at 1–18). Simply stated, the Plaintiff was failing her clinical rotation and the evidence is clear that although she was repeatedly apprised of her shortcomings by clinical supervisors, she refused to listen to or integrate their feedback. That, in addition to the fact that the situations concerning each of the some five other students who Plaintiff seeks to use as comparators to establish disparate treatment did not involve the decisionmaker here, leads the court to conclude that Plaintiff cannot, as a matter of law, successfully rebut the Defendant's non-discriminatory explanation for the action that was taken.[16] (*See* Pl.'s Opp'n at 14–19).

## Conclusion

The Plaintiff was admitted into a specialized graduate program on the recommendation of essentially the same group of academicians who recommended her ultimate dismissal. She remained in the program through successive stages until it was decided that she lacked basic clinical and interpersonal skills to meet the rigorous requirements for matriculation, even after numerous attempts were made to address the situation. Ultimately, the Plaintiff was compelled by her own actions and on her own volition to withdraw under conditions that she requested in order to place her in as favorable a position as possible to try again in the future if she so chose. She was terminated from the program, but the evidence, even at this stage, is insufficient as a matter of law to conclude that the subject decision was made for other than legitimate, non-discriminatory reasons. The Defendant's Motion for Summary Judgment is therefore GRANTED, all remaining motions being DENIED as moot.

An appropriate Order shall issue.

---

16. For the Plaintiff to use evidence of disparate treatment in order to prove racial motivation on even a *prima facie* basis, the circumstances of whatever is being urged as a comparison must be sufficiently similar to draw any conclusions. In the undisputed context of this case, the fact that the Defendant's agent who took different action under allegedly similar circumstances involving other students who were outside the protected class was a different individual than the decisionmaker in Plaintiff's case, is a fatal distinction that effectively exacerbates the possible import of such evidence. While a plaintiff is entitled to establish by showing disparate treatment that illegal discriminatory animus was the basis for an adverse action, administrators of professional schools are entitled to deference in their decisions to admit, retain, or dismiss a student when such evidence is lacking, as it is here. *See Love v. Duke Univ.,* 776 F.Supp. 1070, 1074 (M.D.N.C.1991); *Farmer v. Ramsay,* 159 F.Supp.2d 873, 886 (D.Md.2001); *Beall v. Abbott Labs.,* 130 F.3d 614, 620 (4th Cir.1997).