**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 16 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UTAH ANIMAL RIGHTS
COALITION, a Utah non-profit
corporation,

      Plaintiff-Appellant,

v.

No. 02-4174

SALT LAKE CITY CORPORATION;
SHAWN McDONOUGH; and JOHN
DOES I - X,

      Defendants-Appellees.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:01-CV-818-PGC)**

Brian M. Barnard (James L. Harris, Jr. with him on the brief), Utah Legal Clinic,
Salt Lake City, Utah, for Plaintiff-Appellant.

Steven W. Allred (Martha S. Stonebrook with him on the brief), Salt Lake City
Attorneys' Office, Salt Lake City, Utah, for Defendants-Appellees.

Before **SEYMOUR**, **HENRY**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

In February of 2002, many of the world's most talented athletes, along with spectators, journalists, and world leaders, descended on Salt Lake City, Utah, for the 2002 Winter Olympics. In addition to the officially scheduled Olympic events, many hundreds of groups and individuals used the occasion to speak out on issues of concern through street demonstrations, distribution of pamphlets, evangelism, and other modes of expression. One of those groups was Appellant, the Utah Animal Rights Coalition ("UARC"), an advocacy organization devoted to making "the plight of animals in the world known to people in Utah." The Appellees, defendants below, are Salt Lake City and certain officials who had the responsibility of determining when and where various groups would be permitted to demonstrate, and of issuing permits accordingly. The question is whether the slow pace of the permit process violated the First Amendment.

Almost a year before the Olympics – and well before the City had determined where Olympic events would be held – UARC submitted an application for permits to demonstrate on public property at five specified locations. For approximately eight months, the City took no action on UARC's application. The City then denied UARC's application on account of conflicts with Olympics-related activities, and suggested alternative sites for UARC's demonstrations. UARC filed an amended application and ultimately received

permits to demonstrate at four locations, two of them at or near the locations requested in the amended application. Only two claims are at issue in this case: (1) a facial challenge to the then-operative ordinance, on account of its lack of written deadlines for processing permit applications, and (2) an as-applied challenge contending that the time elapsed in processing UARC's permit application, from March 9 to November 15, 2001, was unconstitutionally prolonged.

The district court granted summary judgment to Defendants with respect to both claims. The court held that UARC lacked standing to bring either claim. In the alternative, the court granted summary judgment on the facial claim on mootness grounds, and on the merits of the as-applied claim. We affirm, but not precisely on the same grounds. We hold that neither standing nor mootness precludes resolution of UARC's claims, but that the claims fail on the merits.

## I. BACKGROUND

### A. Salt Lake City's Permit Ordinance

UARC's application to conduct demonstrations on public property during the Olympics was processed in accordance with Salt Lake City Code § 3.50 (sometimes referred to hereafter as "the Ordinance"). The Ordinance was substantially amended in May, 2002, after the Olympics were over. The following is a summary of the relevant provisions in effect at the time.

In setting procedures for the issuance of permits, the Ordinance distinguishes between "commercially related" and "free expression" activities, and further distinguishes between "short notice" and "advanced planned" activities. UARC's permit was governed by the standard for advanced planned free expression activities, Section 3.50.130:

> **Standards for issuance of permit – Advanced planned free expression activities.**
> The events coordinator shall issue an advanced planned free expression activity permit if the events administrator finds that the provisions of Sections 3.50.110A (arterial routes), 3.50.110B (interference with other events), and 3.50.110C (movement of police and fire vehicles) are met.

Sections 3.50.110A and C assure that major traffic routes remain accessible and that demonstrations do not interfere with public safety vehicles. Section 3.50.110B prohibits interference with:

> 1. Any other commercially related special event,
> 2. Any other event for which a permit under this chapter has already been granted, [or],
> 3. The providing of city services in support of other scheduled events, including free expression activities and unscheduled governmental functions such as visits of chiefs of state.

These provisions give priority to commercially related special events, certain governmental functions, and other events for which a permit was previously granted. They make no reference to the content of the expressive activity, and do not authorize the events coordinator to take the content of the expressive activity into account. In accordance with this provision, the City gave priority to the

-4-

official Olympic events organized by the Salt Lake Organizing Committee ("SLOC"), which had submitted a prior application for a special event permit at various locations in the City.

Once the official Olympic events and provision for public health and safety services were established, the City allocated rights to use public property among the many competing applicants, including UARC. Conflicts among permit applications were governed by § 3.50.180:

> **Permit – Conflicting applications.**
> **A. Conflict Priority Evaluation.** When one or more applications for a commercially related special event or advanced planned free expression activity are received for the same day and for locations or routes which are conflicting, the events coordinator shall issue a permit, subject to the other provisions of this chapter, based on the following order of priorities:
> 1. Events planned, organized or presented by state, federal or city governmental entities or their agents if the governmental request is made in good faith and not with the intent or purpose of improperly chilling constitutionally protected rights of competing petitioners;
> 2. Historic usage commercially related special events or advanced planned free expression activities where the same applicant or sponsor has been granted use of a particular city forum at a particular date, time and place for more than fifteen consecutive years;
> 3. If neither subsections A1 or A2 are applicable, priority shall be given to a first-in-time filing.
> **B. Consideration for Unsuccessful Applicant.** After denying the request for the time, place, manner and date, the events coordinator shall authorize the unsuccessful applicant to use an appropriate public forum at another suitable time place, date and manner.

Like Section 3.50.130, this section is entirely content-neutral. Although it gives

priority to government-sponsored and historic-usage events, these categories are not based on the content of the intended speech; in other respects priority is based on the principle of first come, first served.

The Ordinance also contains provisions for expedited review of the events coordinator's determinations:

> **Expedited Appeals – Free Expression Activities:**
> **A. Determination of Claims:** The following determinations on claims regarding free expression activities may be appealed as provided below:
> . . . .
> 2. A claim by an applicant that the events review committee's denial of a proposed route or location for an activity constitutes an inappropriate or unlawful restriction of time, place or manner restriction [sic]; or
> 3. Any other claim by an applicant that any action by the city regarding the proposed free expression activity impermissibly burdens constitutionally protected rights of the applicant, sponsor, participants or spectators.
> **B. Process:** The city acknowledges an obligation to process appeals regarding free expression activities promptly so as to not unreasonably inhibit or unlawfully burden constitutionally protected activities. To the extent possible, the appeals process related to free expression activities shall be that specified in section 3.50.190[1] of

---

[1]Section 3.50.190 makes reference to the procedures of Section 3.50.200, which provides in pertinent part:
> **B. Procedure.** Appeals shall be made subject to the following procedure:
> 1. Appeals shall be filed with the events coordinator within ten business days after the events coordinator notifies the applicant or sponsor of the decision from which an appeal is taken;
> . . . .
> 3. The appeal shall specify the grounds for the appeal;

(continued...)

this chapter, with the times modified by the events coordinator to allow the necessary expeditious processing. In the event that the applicant for a free expression activity requires even more expeditious processing of an appeal, upon the request of the applicant, the city attorney may advise the mayor or the mayor's designee to make immediate consideration of the appeal.

Code § 3.50.210. Applicants have the right to seek judicial review of the outcome of this appeal process. *See, e.g.*, *Walker v. Weber County*, 973 P.2d 927, 929-30 (Utah 1998) (holding that the writ provision of Rule 65B was properly invoked to allow Utah Supreme Court to determine whether county

---

[1](...continued)
4. The events coordinator shall respond to the appeal with a written explanation of the events coordinator's reasons for the appealed decision within seven business days from the receipt of the appeal;
5. The appeal and the events coordinator's response shall be reviewed by the city attorney who shall, within seven business days, issue a recommendation to the mayor;
6. The mayor or the mayor's designee may schedule a hearing on the appeal or review the appeal based on the written submissions;
7. Any hearing shall be held withing ten business days following the city attorney's recommendation;
8. The mayor or the mayor's designee shall issue a decision on the appeal, in writing, within ten days from the receipt of the city attorney's recommendation or, in the event of a hearing, within ten days from the hearing.
**C. Expedition of regular appeals.** If the applicant notified the events coordinator and demonstrates that the times specified above for the appeals process would unreasonably burden the applicant, the events coordinator shall shorten the times so the applicant may receive the final decision sufficiently in advance of the proposed event.

Code § 3.50.200.

officials improperly changed a ballot initiative); *Renn v. Utah State Bd. of Pardons*, 904 P.2d 677, 682 (Utah 1995) (suggesting that an appeal of decision was also available under the writ provisions of Rule 65B of the Utah Rules of Civil Procedure); *KUTV, Inc. v. Conder*, 668 P.2d 513, 517 (Utah 1983) (noting that a writ was properly invoked in First Amendment context when no other adequate remedy by way of appeal was available).[2]

It is undisputed that the Ordinance, as it existed at the time of this dispute, contained no requirement that the events coordinator process permit applications for "advanced planned free expression activities" within any particular time.

On May 7, 2002, after the events at issue in this case but before the district court held argument on the motions for summary judgment, the City amended its ordinance concerning special events to require all permits for demonstrations to be acted upon within 28 days. *See* Affidavit of Boyd A. Ferguson ("Ferguson Aff."), App. 137-40.

B.    UARC's Application

Almost a year in advance of the Olympics, on March 9, 2001, UARC applied for permits to demonstrate on public property at five locations it expected

---

[2]The Court in *Thomas v. Chicago Park*, 534 U.S. 316, 324 (2002), held that writ provisions of this sort provide sufficient access for judicial review in the context of appeals of denials of permits for use of public property for First Amendment activities.

would be close to scheduled Olympic events, including the Olympic Opening Ceremonies, figure skating events at the Delta Center, and the daily medals ceremonies. Shawn McDonough, the Special Events Coordinator for Salt Lake City, responded to UARC's request by letter on April 5, 2001. In that letter, Ms. McDonough informed UARC that "[t]he City has received a prior application from the Salt Lake Organizing Committee for a special event permit for those times and areas during the Olympic Games." [App. 39.] The letter further stated that the City would respond to UARC's application within 90 to 120 days, that is, by August 3, 2001. The City failed to do so. Ms. McDonough subsequently explained in an affidavit that the

> delay resulted from the extraordinary and unique nature of the Winter Olympics. On August 5, 2002 [sic], the City did not yet know the configuration and exact location of the Olympic Square. The City was also then waiting for information from SLOC and various law enforcement and security agencies regarding security restrictions and regulations regarding the Olympic Square and other areas of the City.

[Affidavit of Julia S. McDonough ("McDonough Aff.") ¶ 7, App. 142-43.]

Then came the terrorist attacks on September 11, 2001. As the district court observed, these attacks substantially heightened security concerns for the Winter Olympics. The City was accordingly forced to delay processing applications relating to the Olympics until law enforcement and security agencies could determine the final security rules and plans for Olympics-related areas, including the Olympic Square.

On October 8, 2001, UARC wrote the City to complain of its failure to act on the organization's permit application. UARC informed the City that it construed the City's failure either to approve or to deny the request as a denial of the application, and requested a review of the denial through the City's appeal process. On October 15, 2001, Ms. McDonough replied to UARC's counsel by letter, stating that any appeal would be premature because its application had not yet been denied, and only a denial of the application was appealable under Code § 3.50.210. [McDonough Aff. ¶ 9, App. 143.] She explained in the letter that

> The City is in the process of preparing the Salt Lake City Olympic Committee's ("SLOC") Large-Scale Special Event permit for the 2002 Olympics. The permit will determine which locations, if any, within the Olympic Square that the City can reserve for demonstrations. Until that determination is made, the City cannot deny or approve your client's applications because the UARC's requested protest areas may or may not be within the approved demonstration locations.

[Letter from S. McDonough to B. Barnard (Oct. 15, 2001), App. 44.] The letter indicated, however, that the SLOC permit would be completed soon.

On October 22, 2001, UARC filed a complaint in federal district court pursuant to 42 U.S.C. § 1983, alleging that the then-applicable Section 3.50 was unconstitutional both on its face and as applied to UARC, because of the delay in processing UARC's permit application. UARC requested a temporary restraining order and preliminary and permanent injunctions requiring the City to process its

-10-

application. It further requested nominal damages and declaratory relief finding that the City had violated UARC's constitutional rights under the First and Fourteenth Amendments.

On November 15, 2001, "as soon as the City learned of the final rules and security plans" regarding the areas UARC proposed as its demonstration sites, Ms. McDonough notified UARC that its application for protest permits at the particular locations UARC had requested had been denied, and suggested several alternative locations for UARC's demonstrations. [McDonough Aff. ¶ 10, App. 143.] Then on November 29, 2001, Ms. McDonough received a letter from UARC modifying the group's prior application. UARC requested permission to demonstrate at the following locations: 1) on the blacktop or sidewalk of North Temple west of 400 West; and 2) on the blacktop of Pierpont Avenue, 30 feet west of 300 West. [McDonough Aff. ¶ 11, App. 143.]

On February 4, 2002, the City approved the requested location on Pierpont Avenue and a location very close to the other requested site, on a parking strip on the west side of 400 West, approximately 200 feet north of the north curb face on North Temple. [*Id.* ¶ 12, App. 143-44.] In addition, UARC was given permits to protest at two additional sites close to Olympic events: at Washington Square and on 500 South close to Rice-Eccles Stadium, the venue for the Olympics' Opening and Closing Ceremonies. [*Id.*] UARC apparently conducted demonstrations at

these sites.

### C. Proceedings in District Court

The district court addressed both UARC's facial and as-applied claims on UARC's motion for summary judgment. Although the City did not formally file a cross-motion for summary judgment, the district court noted that the City essentially asked for summary judgment in its responsive pleadings. The court then exercised its discretion to treat the City's pleadings as a cross-motion for summary judgment, and granted the City summary judgment on all claims. The court held that UARC lacked standing to bring its as-applied challenge and, in the alternative, that the as-applied challenge failed on the merits. It also held that the facial challenge was moot because the City had amended the ordinance in such a way that it addressed UARC's concerns.

Of special relevance to our disposition of this appeal, it is important to note, as did the district court, that "UARC's complaint challenges only the City's delay in processing the March application – that is, the delay from the application on March 9 to the denial on November 15. At argument on this matter, counsel for UARC agreed that the only issue before the Court is appropriateness of the delay from March 9 to November 15." Op. 5. Thus, neither in district court nor in this Court have Appellants challenged either the delay in processing their revised application – from November 29, 2001, to February 4, 2002 – or the

-12-

adequacy of the locations at which they were permitted to demonstrate.

## II.     JUSTICIABILITY

The Constitution commands that we determine whether an Article III case or controversy is before us, whether or not the issue has been properly raised by the parties. U.S. Const. art. III, § 2. In this case, that command requires us to consider both standing and mootness. *See Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002) (standing); *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1181-82 (10th Cir. 2000) (mootness). These jurisdictional limitations help to confine the exercise of judicial authority to cases of a "judiciary nature": those brought by parties who have suffered an actual injury that can be redressed by a judgment of the court. Standing generally deals with the question of "who" and mootness with the question of "when."

### A.     Standing

Standing is an essential part of Article III's case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). There are three elements to Article III standing: 1) injury-in-fact; 2) causation; and 3) redressability. *Essence*, 285 F.3d at 1280. An injury-in-fact is an "'invasion of a legally protected interest' that is (a) concrete and particularized and (b) actual or imminent, i.e., not conjectural or hypothetical." *Id., quoting Defenders of*

*Wildlife*, 504 U.S. at 560. Causation is found upon a showing that the injury is "'fairly trace[able] to the challenged action of the defendant,' rather than some third party not before the court." *Id., quoting Defenders of Wildlife*, 504 U.S. at 560 (brackets in original). Redressability requires the plaintiff to show that it is "likely that a favorable court decision will redress the injury to the plaintiff." *Id.* "The burden to establish standing rests on the party invoking federal jurisdiction." *Id.* When the standing issue is raised at the summary judgment stage, the party moving for summary judgment "must establish that there exists no genuine issue of material fact as to justiciability," and "mere allegations [of injury, causation and redressability] are insufficient." *Dep't of Commerce v. United States House of Representatives*, 525 U.S. 316, 329 (1999).

The district court granted summary judgment against UARC with respect to both its facial and its as-applied challenge, on the ground that "UARC has failed to show any concrete or particularized injury." Op. 5. The district court noted that UARC claimed that delay on the City's part hampered UARC's ability "to organize, coordinate, etc., their activities, demonstrations, protests, etc." *Id.* at 6, *quoting* Diener Aff. ¶ 24, App. 51. But according to the court, the organization was "unable to provide any specific examples of logistical difficulties that resulted from the City's delay," and admitted that it could not show any "special damages." *Id.* Thus the complaint was "simply too speculative to demonstrate

-14-

standing." Op. 6.

We believe that the district court took too narrow a view of Plaintiff's injury. UARC contends that the City's permitting scheme impermissibly delayed the process in direct contravention of the standards mandated by the Supreme Court in *Freedman v. Maryland*, 380 U.S. 51, 58-59 (1965), and *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990). Whether UARC reads those cases correctly may be a matter of some question. But we must not confuse standing with the merits. If UARC is correct on the merits, it was entitled to receive an answer to its permit application long before November, 2001, which would have given the group more time to organize its demonstration (if the permit were granted) or to pursue appeals or modified applications (if it were denied). It may be true, as the district court noted, that the organization was able to overcome any logistical difficulties caused by the delay, and to conduct demonstrations at appropriate locations during the Olympics. If UARC is correct on the merits, however, the group was entitled under the First Amendment to a more expeditious process than it received. The injury may have been small, and – as UARC concedes – insufficient to support a claim for compensatory damages; but it was not "speculative."

B.    Mootness

Mootness presents a more serious hurdle. "[A]n actual controversy must be

-15-

extant at all stages of review, not merely at the time the complaint is filed."
*Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000), *quoting County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). "The crucial question is whether 'granting a present determination of the issues offered . . . will have some effect in the real world.'" *Davidson*, 236 F.3d at 1182, *quoting Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1266 (10th Cir. 1999).

The district court held that UARC's facial challenge to Section 3.50 is moot because the City has amended the ordinance to require review within 28 days, which cures the alleged defect in the original permitting scheme. Op. 10-11. The court did not address whether the as-applied challenge was moot, and instead resolved that claim on the merits and on standing grounds.

The district court was correct that in general, "the repeal of a challenged statute is one of those events that makes it 'absolutely clear that the allegedly wrongful behavior . . . could not reasonably be expected to recur.'" Op. 11, *quoting Davidson*, 236 F.3d at 1182, *quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). Plaintiffs have "no legally cognizable interest in the constitutionality of an obsolete statute. . . . [Such]

-16-

challenges are clearly moot." *Davidson,* 236 F.3d at 1182; *accord Reyes v. City of Lynchburg,* 300 F.3d 449, 453 (4th Cir. 2002) (noting same in context of facial First Amendment challenge to obsolete city parade regulations). UARC concedes that its "facial challenge to the ordinance and request for injunctive relief" have been mooted by the amendment to the Ordinance. Appellant's Br. 12 n.1. Accordingly, the district court was correct to grant summary judgment to the City on UARC's facial challenge to Section 3.50 insofar as UARC sought declaratory and injunctive relief.

For similar reasons, UARC's prayer for "a temporary restraining order, a preliminary injunction and a permanent injunction against the defendants requiring them to process the applications submitted by plaintiff," Complaint ¶ 31, App. 9, is also moot. The alleged violation took place in 2001, the Olympics have come and gone, and neither temporary restraining order, preliminary injunction, nor permanent injunction could have any present-day effect. Moreover, UARC has abandoned any claim for compensatory damages; thus, there is no claim that monetary damages could recompense the Plaintiff for prior injury. *See* Pl.'s Mem. Re: Pl.'s Mot. for Summ. J., App. 90, 91; *see also* Op. 6. Any judgment on the constitutionality of the City's treatment of UARC's 2001 permit application would therefore be of no legal effect. To be sure, there is a recognized exception to mootness principles when a violation is "capable of

repetition, yet evading review." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 594 n.6 (1999); *Honig v. Doe*, 484 U.S. 305, 318 (1988). But that exception is inapplicable here, where the Ordinance has been amended to cure the alleged constitutional problem. This controversy is over, and it will not recur. Accordingly, UARC's as-applied challenge is also moot, insofar as UARC requested injunctive relief.

However, in its complaint, in addition to declaratory and injunctive relief, UARC also sought nominal damages of one dollar in connection with both its facial and its as-applied claim. Complaint ¶¶ 32, 36, App. 10-11; *see also* Appellant's Br. 12 (stating "UARC sought below (and herein seeks) nominal damages in the sum of one dollar ($1.00) as a result of harm suffered by the City's delay and lack of specific written deadlines to process applications for permits.").[3] It may seem odd that a complaint for nominal damages could satisfy Article III's case or controversy requirements, when a functionally identical claim for declaratory relief will not.[4] But this Court has squarely so held. *Comm. for*

---

[3]UARC's brief in this Court is not entirely clear about whether Appellant is appealing dismissal of its facial claim. See Appellant's Br. 12 n.1, 16 n.2. At oral argument, however, when UARC's counsel was asked whether UARC's facial challenge was moot, counsel responded that the case was moot insofar as it related to injunctive relief, but not as it related to declaratory relief and the prayer for nominal damages.

[4] The author of this opinion has written a concurring opinion suggesting that this Court's precedents holding that claims for nominal damages are not moot
(continued...)

-18-

*the First Amendment v. Campbell*, 962 F.2d 1517, 1526 (10th Cir. 1992) (finding that while adoption of a new policy mooted claims for injunctive relief, "the district court erred in dismissing the nominal damages claim which relates to *past* (not future) conduct") (emphasis in original); *O'Connor v. City & County of Denver*, 894 F.2d 1210, 1215-16 (10th Cir. 1990) (same). Thus, although the conduct at issue is long past and will not be repeated, the Ordinance under challenge has been amended to correct its alleged constitutional flaw, and Plaintiff concedes that it suffered no compensable injury, under our precedents this panel is required to determine on the merits whether Defendant's past conduct and no-longer-operative Ordinance comported with the First Amendment.

## III.    The Facial Constitutionality of Former Section 3.50

Regulations governing the use of public property for free expression are not "inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend." *Cox v. New Hampshire,* 312 U.S. 569, 574 (1941). Permitting schemes are necessary to ensure that scarce space is allocated among conflicting applicants, to protect public access to thoroughfares and public facilities, and to enable police, fire, and other public safety officials to function. In general, content-neutral time, place, and manner regulations governing use of public property are permissible so long

---

[4](...continued)
should be overruled, or corrected by the Supreme Court.

-19-

as they are narrowly tailored to serve a substantial governmental interest and leave open ample alternative channels for communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).[5]

UARC does not allege that the former Section 3.50 was content-based or that its permit application was handled differently on account of the content or viewpoint of its message. Rather, UARC's argument is based on the absence of any deadlines for grant or denial of permit applications under Section 3.50. It contends that the Ordinance is a form of prior restraint, and that the absence of written deadlines rendered the former Section 3.50 facially unconstitutional under the Supreme Court's decisions in *Freedman v. Maryland*, 380 U.S. 51 (1965), and *FW/PBS v. Dallas*, 493 U.S. 215 (1990).

In *Freedman*, the Supreme Court invalidated a statute under which a theater owner was required to submit any film it wished to exhibit to the State Board of Censors for advance approval. Among other constitutional defects in this scheme, the Supreme Court noted that the absence of any requirement that the approval process be completed promptly would enable the Board to censor films through delay. The Court thus held that any restraint of speech under such a scheme must "be limited to preservation of the status quo for the shortest fixed period

---

[5] UARC has framed its legal argument in terms of both First Amendment and Due Process, but it has not made any analytical distinction between the two. We therefore address the issues primarily in First Amendment terms.

compatible with sound judicial administration." 380 U.S. at 59. Similarly, in *FW/PBS*, the Court held that a licensing scheme for sexually oriented speech must "set reasonable time limits on the decisionmaker." 493 U.S. at 227 (plurality opinion). *See also Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 802 (1988) (a licensing scheme for solicitations requires definite time limits because "delay compels the speaker's silence"); *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000) (because the plaintiff "is barred from aiding any solicitations within the state until it complies with all the Act's requirements . . . [t]he Act therefore definitionally qualifies as a prior restraint").

As the district court recognized, this case does not present the same problem posed by the prior restraint cases. In *Freedman*, *FW/PBS*, *Riley*, and *American Target*, each day of delay in acting on the application was a day in which the speaker was forced to be silent. As the district court put it: "the government was directly preventing speech at the time the challenge was brought." Op. 6. The same is not true when the desired speech will not take place until some future date. In this case, for example, UARC's desired demonstrations would not take place for almost a year after it filed its application. Thus, "the City's delay in processing UARC's application in no way prevented it from speaking." *Id*. at 8. Thus, while it is true that any "restraint" on speech pursuant to a content-based licensing or censorship scheme must be limited to the

"shortest fixed period compatible with sound judicial resolution," *Freedman*, 380 U.S. at 59, that principle does not undermine Section 3.50, because under that section, speakers are not restrained from speaking at the time of the processing delay.

Moreover, as the district court also concluded, this case is governed not by *Freedman* and its progeny, which apply to content-based licensing or censorship schemes, but by *Thomas v. Chicago Park District*, 534 U.S. 316 (2002). In *Thomas*, the Court upheld a municipal park ordinance requiring groups to obtain a permit before conducting activities in the parks involving more than 50 persons. The Court clarified that the procedural requirements outlined in *FW/PBS*, 493 U.S. at 225-27, which were spawned by the concerns of censorship present in the *Freedman* case, 380 U.S. at 57, were not applicable to ordinances that did not authorize a licensor to "pass judgment on the content of speech." *Thomas*, 534 U.S. at 322. The Court observed that it had "never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in *Freedman*." *Id.*[6] Those requirements were necessary only in cases where the regulators were asked to focus on, or where the

---

[6]*FW/PBS,* held that content-based prior restraints require the following procedural safeguards: "(1) any restraint prior to judicial review can be imposed only for a brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court." 493 U.S. at 227.

-22-

regulations specifically referred to, speech of a specific content. *See id.* at 321 (noting that *Freedman* was concerned with a board's authority to reject films that it found "obscene"); *FW/PBS*, 493 U.S. 227 (similar concern when regulation singles out "sexually oriented businesses"). Among the procedural requirements the *Thomas* Court held inapplicable to content-neutral permit schemes is the requirement of a limit on the time during which speech can be restrained before the decisionmaker acts on the application. Instead, a content-neutral time, place, and manner regulation is constitutional provided that it contains "adequate standards to guide the official's decision and render it subject to judicial review." *Thomas*, 534 U.S. at 323. There is no requirement of a fixed statutory deadline.

UARC's confusion on this point of law is understandable because, prior to the *Thomas* decision, the scope and applicability of the doctrine of prior restraint was far from clear. As the First Circuit recently observed:

> Until very recently, it was unclear whether the *Freedman* formulation applied to content-neutral permit schemes designed to ensure public safety in a traditional public forum. *Compare, e.g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 560 (1975) (stating that *Freedman* applies in a public forum), *with Poulos v. New Hampshire*, 345 U.S. 395, 403 (1953) (suggesting that a different standard applies if the license requirement reflects "a ministerial police routine"). The Supreme Court erased this uncertainty within the past few months. In *Thomas*, the Court clarified that *Freedman*'s procedural requirements do not apply to permit schemes that eschew any consideration of the content of speech . . . . [534 U.S. at 323].

*New England Reg'l Council of Carpenters v. Kington*, 284 F.3d 9, 21 (1st Cir.

2002) (case citations shortened and parallel citations omitted).

As discussed above, Section 3.50 is content-neutral.  In *Rock Against Racism*, the Court stated that "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  491 U.S. at 791.   Section 3.50.020G provides:

> "Free expression activity" means any formation, procession, or assembly upon any public street, park or other public way or other traditional public forum in a manner which does not comply with normal or usual regulations or controls and which claims that it has the purpose of engaging in constitutionally protected speech or assembly.

This provision obviously makes no reference to the content or viewpoint of "free expression" activity.  In administering the Ordinance, City officials are not required – nor are they permitted – to consider the messages applicants intend to communicate.  An animal rights group receives precisely the same consideration as a pro-life demonstration, a religious vigil, or a pep rally for the local basketball team.  Section 3.50 is a measure designed to preserve public safety and "coordinate multiple uses of limited space," *Thomas*, 534 U.S. at 323, while maintaining public safety, without regard to the content of speech or the message or viewpoint of permit applicants.

Under the guidance of *Thomas*, then, our inquiry narrows to whether the regulations: 1) possess adequate standards to guide the exercise of official

discretion and make possible meaningful judicial review; and 2) are narrowly tailored to a significant state interest while leaving open satisfactory alternative means of communication. *See* 534 U.S. at 323 & n.3. UARC does not appear to argue that the Ordinance violates these requirements, and we therefore need not delve into them. Because there is no constitutional requirement for a fixed deadline in the context of permit applications under a content-neutral regulatory scheme, and UARC does not challenge any other aspect of the Ordinance under the *Thomas* criteria, we reject UARC's facial challenge to the former Section 3.50.

## IV.   UARC's As-Applied Challenge

Even apart from its facial challenge to Section 3.50, UARC contends that the City violated its First and Fourteenth Amendment rights by unreasonably delaying a decision on its permit application. Specifically, UARC contends that the roughly 240-day period from March 9, 2001, when it filed its application, to November 15, 2001, when the application was denied, was unconstitutionally protracted, and made it more difficult for UARC "to adequately orchestrate their protests and demonstrations." Appellant's Br. 19. UARC suggests that "a constitutionally reasonable brief period is *less than* 150 days and can be *as long as* 10 days." *Id*. at 21.

We do not agree. Planning for the Winter Olympics was a mammoth

undertaking, made all the more difficult by the security concerns in the wake of September 11. It was not possible to determine where any one group could demonstrate until the official Olympic events were located, security needs assessed, and competing applications taken into consideration. As of October 22, 2001, when UARC filed this lawsuit, the City had not yet finished work on SLOC's Large-Scale Special Event Permit, which had priority. As the City events coordinator wrote to UARC on October 15, 2001:

> The City is in the process of preparing the Salt Lake City Olympic Committee's ("SLOC") Large-Scale Special Event permit for the 2002 Olympics. The permit will determine which locations, if any, within the Olympic Square that the City can reserve for demonstrations. Until that determination is made, the City cannot deny or approve your client's applications because the UARC's requested protest areas may or may not be within the approved demonstration locations.

[Letter from S. McDonough to B. Barnard (Oct. 15, 2001), App. 44.] Once SLOC's large-scale permit was issued, the City acted promptly to deny UARC's original application and to propose acceptable alternative locales for its planned demonstrations. In light of "the extraordinary logistical, security, and other considerations involved in hosting the games," we agree with the district court that "the City's delay in acting on UARC's request was reasonable." Op. 9.

The precedents cited by UARC all involve situations where constitutionally protected speech was delayed by the slow processing of the permit applications. *See* Appellant's Br. 15-22. As noted in the previous section, different

constitutional considerations apply to activities planned in advance. UARC filed

its permit application some eleven months before its demonstrations were to take

place. It may be convenient for applicants to have nearly a year to "orchestrate

their protests and demonstrations," *id.* at 19, but they have no constitutional right

to demand that city officials make decisions affecting countless other people so

long before interrelated decisions have been made. It was reasonable for the City

to work out arrangements for the location and timing of Olympic venues, along

with attendant security and public health and safety concerns, and then to turn its

attention to applications for demonstration permits. The City acted on UARC's

permit roughly two and a half months before the Olympics began. We consider

that more than adequate, under the circumstances, to satisfy the demands of the

First Amendment.[7]

We are more troubled by the fact that UARC did not receive final word on

its modified application until February 4, 2002 – four days before the Winter

Olympics (and UARC's planned demonstrations) were to begin. But in district

court, UARC specifically limited its constitutional challenge to "the delay from

March 9 to November 15." Op. 5. Moreover, the record contains no information

regarding the process between November 15 and April 2, other than the final

---

[7] UARC offered no evidence regarding the amount of advance notice realistically required for a group to stage a successful demonstration, and thus raised no issue of material fact regarding the reasonableness of the two-and-one-half month period.

result.  Thus, we have no basis for opining on whether the time it took the City to give final approval to the four demonstration sites on February 4 was reasonable or constitutional.

**V.  CONCLUSION**

For the foregoing reasons, the decision of the district court is AFFIRMED.

No. 02-4174, *Utah Animal Rights Coalition v. Salt Lake City Corp.*
**McConnell**, J., concurring.

This case is reminiscent of the coroner's verdict in *The Wizard of Oz*: It's not only merely moot, it's really most sincerely moot. In March, 2001, Plaintiffs filed an application for a permit to conduct protests on public property during the 2002 Winter Olympics. At the time Plaintiffs brought this lawsuit, seven months later, the City had not yet acted on their application. Believing they were constitutionally entitled to prompt action on their permit application, Plaintiffs filed suit for a temporary restraining order, preliminary injunction, and permanent injunction "against the defendants requiring them to process the applications submitted by plaintiff," and for a declaratory judgment that the City's Ordinance governing demonstration permits was unconstitutional insofar as it lacked "specific written deadlines in processing applications for permits." Complaint ¶¶ 30, 35, App. 9, 10. Plaintiffs also sought nominal damages of $1 in connection with both their facial and their as-applied claims. *Id.* ¶¶ 32, 36, App. 10-11.

By the time argument took place in district court, the Winter Olympics had taken place; Plaintiffs' application had been denied (two and one half months before the Olympics); Plaintiffs had filed a modified application; they had received demonstration permits; they had conducted demonstrations pursuant to those permits; and the City had amended the Ordinance to require action on permit applications within 28 days. One would think the controversy was over. Plaintiffs nonetheless continue to pursue this litigation, seeking a judicial holding

that the eight-month delay in processing their application was unconstitutional and that the Ordinance in its pre-amended form was facially unconstitutional.

Federal courts, however, are not debating societies to determine whether past actions and defunct ordinances were constitutional. Federal courts exist to resolve live controversies, to remedy wrongs, and to provide prospective relief. There is no relief a court can order now that would undo the delay in processing Plaintiffs' application, which occurred in 2001. Certainly, there is no basis for granting Plaintiffs' requested temporary restraining order, preliminary injunction, or permanent injunction to "process plaintiffs' application." Their application was processed long ago, and there is nothing more to be done. Moreover, because Plaintiffs do not seek compensatory damages, there is no retrospective relief we could grant that might make them whole for the alleged constitutional violation. There is no point in deciding whether the former ordinance was unconstitutional on its face, because it has been amended to correct the alleged constitutional defect. And there is no possibility that Plaintiffs will be subjected to similar, allegedly unconstitutional, treatment in the future, because the amended ordinance now requires prompt decision on permit applications. In other words, this controversy is over, it will not recur, and there is nothing this Court can do to affect the matter. If ever a case were fully and completely moot, it is this one.

The panel was constrained to take jurisdiction in this case because of Tenth

-2-

Circuit precedent holding that a claim for nominal damages precludes dismissal of the case on mootness grounds. *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1526 (10th Cir. 1992); *O'Connor v. City & County of Denver*, 894 F.2d 1210, 1215-16 (10th Cir. 1990). I believe those decisions were incorrect and that either an *en banc* court or the Supreme Court should hold that a case that is otherwise nonjusticiable on account of mootness is not saved by the mere presence of a prayer for nominal damages. I am aware that my position is contrary not only to precedent in this Circuit, but also to the views of a distinguished commentator. *See* 13A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3533.3, at 266 (2d ed. 1984) ("A valid claim for nominal damages should avoid mootness."). Nonetheless, I think that the proposition that a claim for nominal damages automatically precludes mootness is inconsistent with fundamental principles of justiciability.

I

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies. . . . To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (citations omitted); *see also North Carolina v. Rice*, 404 U.S. 244, 246 (1971). "[A]n actual

controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (citations omitted). "[P]ast exposure to alleged illegal conduct does not establish a present live controversy if unaccompanied by any continuing present effect." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996); *see also Horstkoetter v. Dep't of Public Safety*, 159 F.3d 1265, 1276-77 (10th Cir. 1998) (where there is no realistic possibility that the allegedly unconstitutional conduct toward the plaintiff will recur, claims for injunctive and declaratory relief pertaining to past conduct are moot).

It is not enough that a plaintiff wishes to have the moral satisfaction of a judicial ruling that he was right and his adversary was wrong; the relief sought must have legal effect in determining the present and future rights and obligations of the parties. "The crucial question is whether 'granting a present determination of the issues offered . . . will have some effect in the real world." *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000), *quoting Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1266 (10th Cir. 1999); s*ee also Colorado Off-Highway Vehicle Coalition v. United States Forest Serv.*, 357 F.3d 1130, 1133 (10th Cir. 2004) ("A 'case or controversy' no longer exists when it is impossible for the court to grant any effectual relief whatsoever to a prevailing party."); *Air Line Pilots Ass'n v. UAL*

*Corp.*, 897 F.2d 1394, 1396-97 (7th Cir. 1990) (the test is whether the relief sought would "make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)").

This case involves questions of both mootness and standing. These are closely related doctrines. Standing doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court. Mootness addresses whether the plaintiff continues to have such a stake throughout the course of the litigation. The Supreme Court has described the doctrine of mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English*, 520 U.S. 43, 68 n.22 (1997), *quoting United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980), *quoting* Henry Monaghan, *Constitutional Adjudication: The Who and When*, 82 *Yale L.J.* 1363, 1384 (1973).[1]

At the time this suit was filed, the Utah Animal Rights Coalition ("UARC") was allegedly suffering injury by virtue of the City's allegedly unconstitutional delay in acting on its demonstration permit, and the injury could be redressed by

---

[1]To be sure, there are some differences between standing and mootness doctrine, as noted in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190-92 (2000), but those differences are not relevant here.

injunctive relief ordering the City to process the permit application. As the panel opinion explains, UARC thus had standing to bring this suit. As noted above, however, by the time the district court heard argument and rendered its decision, UARC was no longer suffering any ongoing injury as a result of the City's challenged practices and the challenged ordinance had been amended to correct the alleged constitutional flaw. Thus, the "requisite personal interest that existed at commencement of the litigation[,]" *Arizonans for Official English*, 520 U.S. at 68 n.22, no longer existed. The question is whether a claim for nominal damages is sufficient to keep alive a controversy that otherwise is moot.

II

"Nominal damages are damages in name only, trivial sums such as six cents or $1." 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 3.3(2), at 294 (2d ed. 1993). They do not purport to compensate for past wrongs. They are symbolic only. But that does not mean they are without legal import. There are times when an authoritative legal determination of a dispute is all that the parties require: neither damages nor injunctive relief are necessary. Nominal damages can be a practical and effective remedy, both in constitutional and in other civil cases, where there is a genuine case or controversy between the parties but the injury to the plaintiff is not monetary and there is no basis for compensatory damages. *See id.*; *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978). When neighboring landowners wish to

obtain a legal determination of a disputed boundary, for example, one might sue the other for nominal damages for trespass. *See* Douglas Laycock, *Modern American Remedies: Cases and Materials* 561 (3d ed. 2002). In such a case, the dollar is not the real objective of the litigation. The point is to obtain an authoritative judicial determination of the parties' legal rights. The judgment for the plaintiff – reflected in the award of nominal damages – fully redresses the plaintiff's injury, and resolves the boundary dispute for the future. Similarly, plaintiffs sometimes seek nominal damages in libel suits in order to vindicate their reputations by proving that the supposed libel was a falsehood; but they do not necessarily assert that they suffered any monetary loss.[2]

---

[2] In some cases, the plaintiff may seek compensatory damages at the outset of trial, but the court may award nominal damages based on the conclusion that the defendant violated the plaintiff's right but the plaintiff could not prove actual damage. *See, e.g.*, *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980); *cf. Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308 & n.11 (1986) (plaintiff was awarded compensatory damages by the trial court, but on appellate review it was concluded that only nominal damages were appropriate). Professor Laycock describes nominal damages in such cases as a "consolation prize." Laycock, *supra*, at 561. As long as there remains a live controversy over the claim for compensatory damages, the case is not moot. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 478 n.1 (1989); *Powell v. McCormack*, 395 U.S. 486, 495-96 (1969). Thus, when a plaintiff who is awarded only nominal damages at trial appeals on the ground that it should have received compensatory damages, there is a live case or controversy. Similarly, when a defendant challenges an award of compensatory damages on appeal and the appellate court concludes that only nominal damages were appropriate, the case also is not moot. In this case, by contrast, the plaintiff abandoned any claim for compensatory damages at trial, presumably because it could not prove damages. Op. 6 (counsel "conceded that UARC was seeking redress for a 'somewhat abstract violation'

(continued...)

-7-

In this case, nominal damages serve no such purpose. A declaration that the City should have processed Plaintiffs' application more rapidly in 2001 would have no legal significance now; nor would a declaration that the former Ordinance was facially defective. The award of nominal damages would serve no practical purpose, would have no effect on the legal rights of the parties, and would have no effect on the future. As the Supreme Court commented in *Farrar v. Hobby*, in which a plaintiff received only nominal damages, success in this litigation would "accomplish[] little beyond giving [plaintiffs] 'the moral satisfaction of knowing that a federal court concluded that [their] rights had been violated.'" 506 U.S. 103, 114 (1992), *quoting Hewitt v. Helms*, 482 U.S. 755, 762 (1987) (last bracket in original).

An analogy may be drawn to declaratory judgments. Nominal damage awards serve essentially the same function as declaratory judgments; indeed, scholars tell us that nominal damages were originally sought as a means of obtaining declaratory relief before passage of declaratory judgment statutes. *See* Laycock, *supra*, at 561 ("The most obvious purpose [of nominal damages] was to obtain a form of declaratory relief in a legal system with no general declaratory judgment act."); 1 Dobbs, *supra*, at 295 ("Lawyers might have asserted a claim for nominal damages to get the issue before the court in the days before

_____

[2](...continued)
and that UARC could not show any 'special damages.'").

declaratory judgments were recognized."); 13A Wright, Miller & Cooper, *supra*, §

3533.3, at 266 ("The very determination that nominal damages are an appropriate

remedy for a particular wrong implies a ruling that the wrong is worthy of

vindication by an essentially declaratory judgment").  For justiciability purposes,

I see no reason to treat nominal and declaratory relief differently.

It is well established that the Declaratory Judgment Act "enlarged the range

of remedies available in the federal courts but did not extend their jurisdiction."

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *see also*

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 15 (1983);

*United Food & Commercial Workers Union, Local 1564 v. Albertson's, Inc.*, 207

F.3d 1193, 1197 (10th Cir. 2000).  Thus, if a case is otherwise moot, the existence

of a prayer for declaratory relief does not keep the case alive.  *Preiser*, 422 U.S.

395; *Golden v. Zwickler*, 394 U.S. 103 (1969); *see Facio v. Jones*, 929 F.2d 541,

544 (10th Cir. 1991) ("plaintiff cannot maintain a declaratory or injunctive action

unless he or she can demonstrate a good chance of being likewise injured in the

future"); 10B Wright, Miller & Cooper, *supra*, § 2757, at 495 (1998) ("a

declaratory judgment cannot be given, if a matter has become moot").  The same

should be true of nominal damages.  Nominal damages, like declaratory judgments,

are a form of remedy available in cases where the court has Article III jurisdiction.

Enlargement of the remedies available to the courts does not expand their

jurisdiction.

Indeed, if appending a claim for nominal damages were sufficient to create standing or to avoid mootness, litigants could manufacture Article III jurisdiction by the mere expedient of pleading. It is hard to conceive of a case in which a plaintiff would be unable to append a claim for nominal damages, and thus insulate the case from the possibility of mootness. Article III justiciability should not be so manipulable.

This is not to say that a lawsuit in which nominal damages are the only claim for relief is always or necessarily moot. The question, as with declaratory judgment actions involving past conduct, is whether an award of nominal damages will have practical effect on the parties' rights and responsibilities in the future. *Preiser*, 422 U.S. at 401-04; *Golden*, 394 U.S. at 108-10; *see also Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (per curiam) (holding that entry of a declaratory judgment after a case had become moot does not constitute "relief" for purposes of attorneys fees under § 1988 because it does not "affect the behavior of the defendant toward the plaintiff"). For reasons already explained, a declaratory judgment action involving past conduct that will not recur is not justiciable. That is equally true here. Labeling the requested relief "nominal damages" instead of "declaratory judgment" should not change the analysis.

The Supreme Court has noted that where constitutional rights have been

violated, an award of nominal damages "recognizes the importance to organized society that those rights be scrupulously observed." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986). It might be argued that vindication of such rights remains important even when the legal rights and obligations of the parties will not be affected by the remedy. But the argument proves too much; it is essentially an argument against the mootness doctrine in constitutional cases. If society's interest in "vindicating" constitutional wrongdoing in this abstract sense were sufficient to support Article III justiciability, no constitutional case would ever become moot.

### III

The Supreme Court has never held that a claim for nominal damages is sufficient to maintain the justiciability of a case that otherwise would be moot. In neither of the Supreme Court's leading cases on nominal damages did the issue of mootness arise. *See Carey*, *supra; Memphis Community School Dist.*, *supra*. In *Carey*, the plaintiffs had received a substantial damages award from the jury. The Supreme Court reversed that award, held that the plaintiffs were entitled to "at least" nominal damages, and remanded to the lower court to determine whether the plaintiffs were also entitled to compensatory damages. Because compensatory damages remained at issue both in the Supreme Court and on remand, there is no question that the case presented a live controversy. 435 U.S. at 266-67. In

-11-

*Memphis Community Schools*, the trial court awarded compensatory damages, but on appeal the Court found that the plaintiff was entitled only to nominal damages. The cases contain no suggestion that the presence of a claim for nominal damages would prevent a case from becoming moot, because in both cases, the plaintiffs' entitlement to *compensatory* damages was a live issue at each stage of the litigation.

*Arizonans for Official English* is the only case in which the Supreme Court has discussed the relation between mootness and nominal damages. There, the Court reversed a lower court ruling that the case was not moot on account of a claim for nominal damages against the State of Arizona. 520 U.S. at 69-72. Because the State was immune from damages,[3] the Court held that what it called "the nominal damages solution to mootness" did not apply. *Id*. at 69 n.24. The Court neither embraced nor repudiated the underlying assumption that a claim for nominal damages could save a lawsuit from mootness where nominal damages *are* available.

The Supreme Court has held that nominal damages can suffice to make the plaintiff a "prevailing party" for purposes of entitlement to attorneys fees. *Farrar v. Hobby*, 506 U.S. at 115; *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of*

---

[3]The State was immune because 42 U.S.C. § 1983, under which the suit was brought, creates no remedy against a state, *Arizonans for Official English*, 520 U.S. at 69, and because the State was not a party to the litigation, *id*. at 69-70.

*Health & Human Res*., 532 U.S. 598, 604 (2001). That is not inconsistent with the proposition that a claim for nominal damages can become moot. It stands only for the proposition that where nominal damages are properly awarded in a case within the court's Article III jurisdiction, the plaintiff has "prevailed" within the meaning of 42 U.S.C. § 1988.

This Court has twice squarely held that a claim for nominal damages precludes dismissal for mootness. In *Committee for the First Amendment v. Campbell*, 962 F.2d 1517 (10th Cir. 1992), a university student group challenged the decision of university officials to bar exhibition of a controversial film – *The Last Temptation of Christ* – but before the district court rendered a decision, the officials rescinded the order and the film was shown; subsequently the University adopted a new policy that comported with the First Amendment. The students persisted in the litigation, seeking declaratory and injunctive relief, as well as monetary damages. This Court held that the student's claim for injunctive relief was moot, both with respect to the specific film (which was advertised and shown on the dates it was originally scheduled) and with respect to university policy (which had been amended to eliminate the claimed constitutional defect). *Id*. at 1524-26. The Court held, however, that the students' claim for nominal damages was not moot. The Court analyzed the question as follows:

> Neither the showing of the film on the originally scheduled dates, nor
> the subsequent enactment of the 1991 policy erases the slate

concerning the alleged First Amendment violations in connection with the film. Therefore, the district court erred in dismissing the nominal damages claim which relates to past (not future) conduct. If proven, a violation of First Amendment rights concerning freedom of expression entitles a plaintiff to at least nominal damages.

*Id.* at 1526-27 (emphasis in original), *citing Carey*, *supra*; *Fyfe v. Curlee*, 902 F.2d 401, 406 (5th Cir. 1990); *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980).

As explained above, I believe this analysis is inconsistent with principles of justiciability. The reason compensatory damage claims do not become moot is that, if awarded, they have real legal effect: the plaintiff is made whole and the defendant pays the costs of its misconduct. Nominal damages, by contrast, are "damages in name only." 1 Dobbs, *supra*, at 294. They have only declaratory effect and do not otherwise alter the legal rights or obligations of the parties. As such, they can sometimes constitute effectual relief, but only with respect to future dealings between the parties. Where, as in *Committee for the First Amendment*, like the instant case, the challenged past conduct did not give rise to a compensable injury and there is no realistic possibility of a recurrence, nominal damages have no more legal effect than would injunctive or declaratory relief in the same case.

None of the cases cited by the Court in *Committee for the First Amendment* suggested that nominal damages claims are immune from dismissal for mootness.

-14-

In all of them, the plaintiffs sued for compensatory damages, reinstatement, or other forms of effectual relief for alleged past misdeeds, in addition to nominal damages. In *Carey*, as already explained, a live claim for compensatory damages was at issue at every stage of the litigation. In *Fyfe*, the court concluded that the plaintiff, who had lost on the merits in district court, had proven a constitutional violation and was entitled at least to nominal damages; the appellate court remanded for consideration of other remedies, including reinstatement. 902 F.2d at 406. In *Familias Unidas*, the court affirmed the district court's conclusion that the plaintiff, though correct on the merits, had "failed to prove any actual, compensable injury." 619 F.2d at 402. The court held that the proper remedy was a declaratory judgment and nominal damages. *Id.* Each of these cases, therefore, was a live controversy over compensatory damages and other forms of concrete relief. In none of these cases did the plaintiff go to court on a bare claim for nominal damages.

In *O'Connor v. City and County of Denver*, 894 F.2d 1210 (10th Cir. 1990), commercial movie theaters sued for declaratory and injunctive relief against the enforcement of a municipal entertainment licensing ordinance, and for damages for past enforcement actions. During the pendency of the lawsuit, the City repealed the challenged ordinance. The plaintiffs conceded their claims for injunctive and declaratory relief were therefore moot, and at trial they withdrew their claims for

damages except nominal damages. *Id*. at 1215. This Court held that "Plaintiffs'

withdrawal of claims coupled with the failure of their proof did not moot their

claim for nominal damages." *Id*. In explanation, the Court relied on the

unexceptional proposition that "'by definition claims for past damages cannot be

deemed moot.'" *Id.*, *quoting Taxpayers for Animas-La Plata Referendum v.*

*Animas-La Plata Water Conservancy Dist*., 739 F.2d 1472, 1479 (10th Cir. 1984).

The Court then stated:

> There is no question that the nominal damages sought in this case
> were past damages not affected by any changes in the Code. We hold
> that repeal and amendment of the Code did not moot plaintiffs' claim
> for nominal damages.

*Id*.

Again, for reasons already explained, I do not think this reasoning is in

conformity with constitutional requirements regarding justiciability. The reason

compensatory damages (the remedy sought in *Taxpayers for Animas-La Plata*

*Referendum*) do not become moot is that they constitute effectual relief for the

plaintiff's past losses. Nominal damages are more akin to declaratory relief, and

should be subject to the same justiciability principles.

Outside of this Circuit, the cases are mixed. The Sixth and Ninth Circuits,

like ours, squarely hold that a claim for nominal damages is sufficient to render a

case justiciable. *See e.g.*, *Murray v. Bd. of Trustees, Univ. of Louisville*, 659 F.2d

77, 79 (6th Cir. 1981); *Yniguez v. Arizona*, 975 F.2d 646, 647 (9th Cir. 1992).

Second Circuit panels appear to have taken inconsistent positions on the issue. *Compare Hernandez v. European Auto Collision, Inc.*, 487 F.2d 378, 387 (2d Cir. 1973) (holding that a claim for nominal damages does not avoid mootness), *with Davis v. Village Part II Realty Co.*, 578 F.2d 461, 463-64 (2d Cir. 1978) (holding that in a civil rights action, the availability of either nominal or substantial damages was sufficient to avoid mootness). The Seventh Circuit has suggested, but not held, that a claim for nominal damages is insufficient to avoid mootness. *Lister v. Lucey*, 575 F.2d 1325, 1336 (7th Cir. 1978). Other circuits have held that cases are not moot where there are claims for both nominal and compensatory or punitive damages. *E.g., Doe v. Delie*, 257 F.3d 309, 313-14 & n.3 (3d Cir. 2001) (case is not moot where plaintiff has a claim to both nominal and punitive damages); *Henson v. Honor Comm. of the Univ. of Virginia*, 719 F.2d 69, 72 n.5 (4th Cir. 1983) (case not moot where plaintiff sought compensatory damages and if he should prevail would be entitled to "at least nominal damages").

I therefore conclude that although the issue is resolved in this Circuit, it has not been resolved by the Supreme Court or by the weight of authority nationwide.

IV

In his concurring opinion, Judge Henry rightly asks what effect a ruling that nominal damages claims can become moot would have on the availability of attorneys fees under 42 U.S.C. §1988, and hence on the incentives for civil rights

-17-

plaintiffs to bring lawsuits challenging unconstitutional state action. Indeed, the most likely reason why a plaintiff would continue to pursue litigation, despite the cost, when a favorable judgment would have no practical effect, is the possibility of obtaining fees.

In *Farrar*, the Supreme Court held that a §1983 plaintiff who seeks compensatory damages but receives only nominal damages is a "prevailing party" for purposes of attorneys fees under 42 U.S.C. § 1988 – though it also held that in such a case "the only reasonable fee is usually no fee at all." 506 U.S. at 115. Presumably, a plaintiff who seeks only nominal damages, and prevails on the claim, would also be a "prevailing party." The entitlement of such a party to attorneys fees would be determined according to the factors set forth by Justice O'Connor in her concurrence in *Farrar*, 506 U.S. at 121-22, and adopted by this Circuit in the context of declaratory relief in *Phelps v. Hamilton*, 120 F.3d 1126, 1131-32 (10th Cir. 1997).

But the prospect of attorneys fees does not affect whether the underlying claim is justiciable. As the Supreme Court has stated, the "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) (citation omitted); *see also Diamond v. Charles*, 476 U.S. 54, 70-71 (1986); *Citizens for Responsible Gov't State Political Action*

*Comm. v. Davidson*, 236 F.3d 1174, 1183 (10th Cir. 2000) (citations omitted). If a case becomes moot during the course of litigation, "the expiration of the underlying cause of action does not moot a controversy over attorney's fees already incurred," but at the same time, a live claim for attorneys fees does not prevent the case from becoming moot. *Dahlem v. Bd. of Educ. of Denver Pub. Schs.*, 901 F.2d 1508, 1511 (10th Cir. 1990).

The as-applied claim in this case became moot when the City acted on UARC's permit application, and the facial claim became moot no later than when the City amended the Ordinance. Both events occurred before the district court rendered any decisions in the case. It surely follows that Plaintiffs would not be entitled to any fees for legal work performed after the case became moot (even assuming, contrary to fact, that they were prevailing parties[4]). As the Court stated in *Rhodes*, 488 U.S. at 4: "The case was moot before judgment issued, and the judgment therefore afforded the plaintiffs no relief whatsoever. In the absence of relief, a party . . . is not entitled to an award of attorney's fees."[5]

As to legal work performed before the case became moot, it would have

---

[4] In this case, Plaintiffs lost on the merits both in the district court and in this Court, and thus are not prevailing parties under any definition.

[5] In *Stewart*, the plaintiffs obtained a declaratory judgment against the defendants. To be consistent with the later-decided *Farrar*, *Stewart* is probably best understood not as holding that the plaintiffs were not "prevailing parties" but that, as in *Farrar*, "the only reasonable fee" was "no fee at all." 506 U.S. at 115.

been arguable, prior to *Buckhannon*, that this work was eligible for attorneys fees on the theory that it was the "catalyst" for Salt Lake City's decision to amend the Ordinance. In *Buckhannon*, however, the Supreme Court held that plaintiffs are not entitled to attorneys fees under § 1988, even if their legal efforts induced the defendant to change its prior unconstitutional practices, unless the litigation resulted in some form of judicial relief. 532 U.S. at 603. Whether one agrees with the result in *Buckhannon* as a matter of policy (Congress is free to change the result by amending § 1988), the availability of attorneys fees should depend on the actual consequences of the litigation, and not on whether the plaintiff used the label "nominal damages" in its prayer for relief.

One of the perverse consequences of treating nominal damages as an exception to ordinary mootness principles is that it would create an incentive for plaintiffs in cases covered by fee-shifting statutes to continue to run up legal bills even after the underlying dispute no longer presents any justiciable legal controversy. Section 1988 was enacted by Congress to encourage civil rights plaintiffs to undertake private enforcement, S. Rep. No. 1011, 94th Cong., 2nd Sess. 2 (1976), reprinted in 1976 U.S.C.C.A.N. 5908. 5910, but there is no public interest in prolonging litigation after it ceases to serve any practical purpose. *See Farrar*, 506 U.S. at 121-22 (O'Connor, J., concurring), *cited in Phelps*, 120 F.3d at 1131-32 (basing the availability of attorneys fees in cases of nominal damages

or declaratory relief, in part, on "whether the judgment vindicates important rights and deters future lawless conduct as opposed to merely 'occupying the time and energy of counsel, court, and client.'").  If a claim for nominal damages cannot become moot, and is eligible for fees under § 1988 (albeit subject to the *Farrar* factors), plaintiffs may be induced to waste legal and judicial resources by continuing litigation when there is no longer any point to it.  If the concern is how a plaintiff could ever get a recalcitrant defendant to change its conduct without the expenditure of precious resources for legal representation, the answer is to amend § 1988 to authorize fees for "catalyst" actions, not to allow plaintiffs to continue to litigate otherwise moot legal claims merely because they have alleged nominal damages.

V

*Committee for the First Amendment* and *O'Connor* are squarely on point, and thus govern disposition of this case by the panel.  I do not believe, however, that their holding is consistent with general principles of justiciability.  Nor is the matter settled by Supreme Court precedent or by the weight of authority in the other circuits.  I therefore concur in the panel's decision reaching the merits of this moot controversy, while suggesting that in an appropriate case, either this Court sitting en banc or the Supreme Court, should examine the question.

No. 02-4174, *Utah Animal Rights Coalition v. Salt Lake City Corp.*
**Henry**, J., concurring.

I fully concur in the reasoning of the majority opinion, which I join. I write separately because of my concern that the coroner's verdict in my colleague's concurrence to his majority opinion may, like the famed rumors of Twain's demise, be somewhat "exaggerated."

It may in fact be true, that the Munchkin coroner would determine that the Wicked Witch of the East was most sincerely moot. However, Dorothy's case or controversy was certainly not "really most sincerely moot." There were other disputes still alive: Wiccanal interference with First Amendment rights had not been eliminated, illegal activity was capable of repetition and potentially evading review, and collateral consequences included that matter of not only nominal, but eventually *liquidated* damages.

Nominal damages live in Oz, in this and other circuits, and in numerous state courts, and they often serve a vital purpose. My colleague's concurrence's major contribution, I believe, is to suggest the vigorous application of court discretion with respect to attorney fees when nominal damages do not vindicate constitutional values.

I.

Judge McConnell questions our circuit precedent, and that of several other circuits and many state courts, which allows a claim for nominal damages to keep

an otherwise moot case alive. But a legal principle exists for a reason, and often, as Justice Holmes famously noted, for experiential reasons rather than logical ones. I believe, as stated, that my colleague makes an important contribution that might call forth some academic discussion about these issues. However, I believe the best response to his concern is to use the tools we now have to rein in excessive attorney fees and thereby reduce litigation commenced only for that purpose. We should be careful before we abandon the long-held view that nominal damages may keep a constitutional case alive.

Mootness and standing jurisprudence are certainly confusing. *See* Erwin Chemerinsky, *A Unified Approach to Justiciability*, 22 CONN. L. REV. 677 (1990) ("The entire area of justiciability is a morass that confuses more than it clarifies."). Professor Chemerinsky, Judge McConnell, and I agree that the essential question is "whether granting a present determination of the issues offered . . . will have some effect in the real world." Concurrence at 5 (McConnell, J.) (quoting *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000) (internal quotation marks omitted)); *see* Chemerinsky, *supra*, at 697 ("If a federal court ruling in favor of the plaintiff would have no effect-if the world will remain the same-then the court likely is wasting its time and is just rendering an advisory opinion."). Where we seem to differ is as to the importance, as Justice Powell puts it, of the

"scrupulous[] observ[ation]" of certain absolute rights. *Carey v. Piphus*, 435 U.S. 247, 266 (1978).

II.

As my colleague notes in section II of his concurrence, the fact that damages are nominal does not mean they may not be important. *See Farrar v. Hobby*, 506 U.S. 103, 121 (1992) (O'Connor, J., concurring) ("Nominal relief does not necessarily a nominal victory make."). He points out that nominal damages are important in libel cases or boundary disputes. He also notes, but seeks to distinguish for today's purposes, Supreme Court precedent that awards nominal damages when compensatory damages were sought but not proved. *See* Concurrence at 7-8 (McConnell, J.) (citing *Carey*, 435 U.S. at 266-67; *id.* at 11 (citing *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986)).

However, the cases clearly do not say that nominal damages do not provide justiciability. In *Carey*, two elementary and secondary school students in Illinois had been suspended from school for twenty days without being provided appropriate procedural due process. The Supreme Court ruled that in the absence of proof of actual injury, students whose procedural rights were violated, but whose suspensions were justified on the facts, are entitled to recover only nominal damages "not to exceed one dollar." 435 U.S. at 266-67. In so doing, the Court

noted the common law foundation for granting nominal damages in certain cases:

> Common-law courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Id.* at 266. The Court thus *remanded* the case for determination of those nominal damages–that is, to determine whether the right that must "be scrupulously observed" has been violated, and what sort of nominal damages ("not to exceed one dollar," *id.* at 267, but certainly an important dollar) should be awarded. That the Court held that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury," *id.* at 267, only underscores the argument that the denial of a substantive constitutional right is indisputably actionable for nominal damages.[1]

---

[1] *See* Hans Linde, *Due Process of Lawmaking*, 55 NEB. L. REV. 197, 255

(continued...)

Judge McConnell concludes that *Carey* and *Memphis* give rise to the argument that there can be no mootness in constitutional cases, and that it is difficult to imagine a case in which a plaintiff could not insulate the case from mootness by appending a claim for nominal damages. But this is what these cases (each authored by the distinguished and highly regarded Justice Powell) hold–with no dissent in either case. The Tenth Circuit does not stand alone in its reading of these cases and the policies behind them.[2]

---

[1](...continued)
(1976) ("If this republic is remembered in the distant history of law, it is likely to be for its enduring adherence to legitimate institutions and processes, not for its perfection of unique principles of justice and certainly not for the rationality of its laws.").

[2]    *See Bernhardt v. County of L.A.*, 279 F.3d 862, 871 (9th Cir. 2002) ("[W]e must conclude that [plaintiff's] claims for prospective relief are moot, although we hold that her possible entitlement to nominal damages creates a continuing live controversy."); *Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001) (holding that where claims for injunctive and declaratory relief were moot, and claim for compensatory damages was prohibited, "[t]he availability of damages or other monetary relief almost always avoids mootness"); *Van Wie v. Pataki,* 267 F.3d 109, 115 n.4 (2d Cir. 2001) (noting that to avoid potential for mootness, "for suits alleging *constitutional* violations under 42 U.S.C. § 1983, it is enough that the parties merely request nominal damages") (emphasis added); *Yniguez v. Arizona*, 975 F.2d 646, 647 (9th Cir. 1992) (per curiam) ("The possibility that [plaintiff] may seek nominal damages on appeal is sufficient to prevent mootness."), *vacated on other grounds*, 520 U.S. 43 (1997); *Beyah v. Coughlin*, 789 F.2d 986, 988-89 (2d Cir. 1986) (although claims for declaratory and injunctive relief were moot, plaintiff's "claim for damages would not be moot since it is now well established that if he can prove that he was deprived of a *constitutionally* protected right, and if defendants are not able to establish a defense to that claim, [he] will be entitled to recover at least nominal damages.") (emphasis added); *Wiggins v. Rushen*, 760 F.2d 1009, 1011-12 (9th Cir. 1985)

(continued...)

The fact that nominal damages may be similar to declaratory judgments does not mean they shouldn't be awarded–rather, it may just mean that some sort of justiciable issue survives because there is still declaratory judgment-like jurisdiction. Furthermore, we have indicated in an unpublished decision that "[t]he unique justiciability limits on declaratory judgment actions . . . do not apply to actions seeking nominal damages, even if the practical effects of both actions are similar." *McDaniels v. McKinna,* No. 03-1231, 2004 WL 887356, at *4 (10th

---

[2](...continued)
("Even if [plaintiff's] transfer to [a different facility] prevented him from receiving injunctive relief, his claim for [nominal] damages survived."); *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 72 n.5 (4th Cir. 1983) (indicating trial court's suggestion that procedural due process claims were moot was in error, noting "[t]he Supreme Court has made it plain that the deprivation of procedural due process creates an independent right to seek, at a minimum, nominal damages"); *Murray v. Bd. of Trs., Univ. of Louisville,* 659 F.2d 77, 79 (6th Cir. 1981) (although claims for declaratory and injunctive relief were moot, and dismissal of plaintiff's claim for actual damages was not clearly erroneous, under *Carey,* district court must "consider in this § 1983 action plaintiff's claims for nominal damages and attorney fees"); *see also* 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3533.3 at 262 (2d ed. 1984) ("Damages should be denied on the merits, not on grounds of mootness."); *id.* at 266 ("A valid claim for nominal damages should avoid mootness."); *id.* ("The very determination that nominal damages are an appropriate remedy for a particular wrong implies a ruling that the wrong is worthy of vindication by an essentially declaratory judgment."). *But see Hernandez v. European Auto Collison, Inc.*, 487 F.2d 378 , 387 (2d Cir. 1973) (Timbers, J., concurring) (where plaintiff did not have standing to challenge New York's lien law, "[n]ot having found a justiciable controversy permitting a declaration, the claim for nominal damages, which is clearly incidental to the relief sought, cannot properly be the basis upon which a court should find a case or controversy where none in fact exists") (internal quotation marks omitted).

Cir. Apr. 27, 2004) (reversing district court's entry of summary judgment on mootness grounds) (citing *O'Connor v. City and County of Denver*, 894 F.2d 1210 (10th Cir. 1990) and *Committee for the First Amendment v. Campbell*, 962 F.2d 1517 (10th Cir. 1992).

Of course, there can still be moot cases in constitutional matters. For example, when the cause of action does not survive (privacy claims, defamation), a plaintiff's death would moot the case. A defendant could also simply *pay* the nominal damages, thereby mooting the case (and rely on this circuit's adoption of Justice O'Connor's factors to evaluate attorney fees from *Farrar*, 506 U.S. 103, to defend against attorney fee claims).

The very issue before us provides a case in point. Although we have disagreed with the district court's view of standing, we have determined, as the district court did, that the same claims were moot and that, on the merits, the plaintiffs are not entitled to nominal damages (despite the fact that with more clear and artful lawyering a claim for compensatory damages might have been stated).

Finally, although a plaintiff may seek to keep a case alive by manufacturing a claim of nominal damages, there is little incentive to do so. A truly nominal victory, after *Farrar* and our court's adoption of Justice O'Connor's *Farrar* factors, will result in no fee. A plaintiff who manufactures such a claim will simply be creating more expense for itself.

III.

I differ slightly with my distinguished colleague as well on his reading of *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598, 604 (2001), and *Farrar*. Contrary to Judge McConnell's view, it seems that the Supreme Court has stated, or at least come very close to stating, that nominal damages *do* prevent mootness. *See Buckhannon*, 532 U.S. at 604-05 (noting that, under the FHAA and the ADA, there must be a "judicially sanctioned change" in the parties' legal relationship before a party is entitled to an award of attorneys' fees, and that "[w]e have held that even an award of nominal damages suffices under this test"); *Farrar*, 506 U.S. at 115 ("As we have held, a nominal damages award does render a plaintiff a prevailing party by allowing him to vindicate his 'absolute' right to procedural due process through enforcement of a judgment against the defendant."); *see also City of Riverside v. Rivera,* 477 U.S. 561, 574 (1986) ("Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms."); *Carey,* 435 U.S. at 266. Thus an award of nominal damages is a judicially sanctioned change in the parties' legal relationship. *See also* Michael Ashton, Note, *Recovering Attorneys' Fees with the Voluntary Cessation Exception to Mootness Doctrine after* Buckhannon Board and

-8-

Care Home, Inc. v. West Virginia Department of Health and Human Resources, 2002 WISC. L. REV. 965, 979 (2002) ("Even a claim for nominal damages prevents the case from becoming moot.").

Further, this holding is not necessarily problematic when coupled with other jurisprudence, as the Note cited above indicates. *Id.* (noting that although a claim for nominal damages prevents mootness, "the plaintiff might recover little if any attorneys' fees upon winning only nominal damages."). As stated above, Justice O'Connor's *Farrar* factors for determining whether fees are justified have been adopted in this circuit. *Farrar*, 506 U.S. at 120-22 (O'Connor, J., concurring) (outlining factors as (1) the difference between the judgment recovered and the recovery sought; (2) the significance of the legal issue on which the plaintiff prevailed; and (3) the public purpose served by the litigation); *see Phelps v. Hamilton*, 120 F.3d 1126, 1130 (10th Cir. 1987) (adopting Justice O'Connor's factors). In *Barber v. T.D. Williamson, Inc.*, 254 F.3d 1223, 1232 (10th Cir. 2001), we applied the *Farrar* factors and noted some courts have concluded that "a public goal is accomplished if the plaintiff's victory encourages attorneys to represent civil rights litigants, affirms an important right, puts the defendant on notice that it needs to improve, and/or provokes a change in the defendant's conduct." We have ample guidance as to how to assess the validity of an attorney fee claim. *See id.*; *Jones v. Lockhart*, 29 F.3d 422, 423-24 (8th Cir. 1994)

(applying the three O'Connor *Farrar* factors); *Cartwright v. Stamper*, 7 F.3d 106, 109-10 (7th Cir. 1993) (same). The factors do assist a district court, which has discretion anyway, in determining whether plaintiffs should receive fees. And would-be plaintiffs had better think about them before initiating suit.

Judge McConnell suggests that the quoted language from *Farrar* and *Buckhannon* is of limited application: "where nominal damages are properly awarded in a case within the court's Article III jurisdiction, the plaintiff has "'prevailed'" within the meaning of 42 U.S.C. § 1988." Concurrence, at 12 (McConnell, J.). I don't read the language quite so narrowly. If the case were moot under *Buckhannon*, obviously no fees could be awarded. The language must mean that if a plaintiff seeks to vindicate her absolute right through a nominal damages award, then we still have a case or controversy, and there are no prudential reasons to avoid hearing the case.

IV.

In conclusion, I believe that the Supreme Court has directly and indirectly indicated that a claim for nominal damages in a constitutional case may vindicate rights that should be scrupulously observed, and hence, such a case is not, nor should it be, moot. Our society still recognizes that constitutional rights may have to be declared, even if they do not give rise to easily calculated damages.

Further, I believe that our evolving jurisprudence in attorney fee matters gives a disincentive to plaintiffs proceeding with cases where no real damage exists, or where a victory will be so nominal as to result in a nominal attorney fee. I imagine the plaintiff in this case understands what I mean.